PHILIP D. RUPERT, JR., et al., Respondents, v CHARLES J. SELLERS, JR., et al., Appellants.

Fourth Department, December 15, 1978

APPEARANCES OF COUNSEL

*Paul, Weiss, Rifkind, Wharton & Garrison (Lewis A. Kaplan* and *Richard Kurnit* of counsel) and *Watson, McGarvey, Hetzelt & Bennett (Joseph L. Watson* of counsel), for appellants.

*Harris, Beach, Wilcox, Rubin & Levey (James M. Hartman,*

*Edward H. Fox* and *Douglas S. Gates* of counsel), for respondents.

## OPINION OF THE COURT

Simons, J.

The members of this court are unanimous in their opinion that the plaintiffs are entitled to recover in this action, and the opinion of Justice Cardamone ably sets forth our resolution of the several issues presented by the parties. Three of us, however, do not find it necessary to predicate our decision upon the Supreme Court's ruling that there may be no liability without fault in certain defamation actions as enunciated in *Gertz v Robert Welch, Inc.* (418 US 323). Indeed, for the reasons which follow we find it inappropriate to do so.

This action was tried two years after the Supreme Court decided *Gertz* and defense counsel in this case was familiar with it. Notwithstanding that earlier decision, counsel in this case requested the court to charge the jury on the traditional common-law rules of libel per se and the court did so without further request or exception. The law as charged thus became the law of the case not open to review in this court. Defendants now urge, for the first time, that the trial court should have applied a fault standard. Obviously the action was not tried or submitted to the jury on that theory and we should not try now to sort out the evidence and isolate statements of the charge to fit the case within some unspecified and amorphous rule unsolicited at the time of trial.

Moreover, we disagree with Justice Cardamone's belief that *Gertz,* as implemented by the Court of Appeals decision in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196), established a rule which binds us in this case and that there may be no liability in *any* defamation action without proof of fault. The court in *Gertz* held that the States "so long as they do not impose liability without fault * * * may define for themselves the appropriate standard of liability for a *publisher* or *broadcaster* of defamatory falsehood injurious to a private individual." (418 US 323, at p 347; emphasis added.) Responding to that decision New York's highest court decided in *Chapadeau* that in matters "arguably within the sphere of legitimate public concern," a plaintiff allegedly defamed could recover from a publisher or broadcaster but only upon a showing that defendant's conduct was grossly irresponsible *(Chapadeau v Utica Observer-Dispatch, supra,* p 199).

Logically, it may be contended that these decisions should be extended because a private individual's right to free speech is no less valuable than that of a publisher or broadcaster and therefore it should be protected by similar standards of proof (see, e.g., Restatement, Torts 2d, § 580B). Neither the Supreme Court nor any New York court, however, has required proof of fault before recovery is permitted in cases such as this which involve private communications by private individuals about private matters. It is particularly inappropriate for an intermediate appellate court to do so upon this record. The Court of Appeals stated well the dangers: "[I]n any defamation case it is perilous, and may be misleading, to generalize about rules unless their consideration is necessary to the disposition of the individual case. The hazard is both tempting and particularly to be eschewed when the applicable law, as in this field, is subject to fluctuating change, due in large measure to the struggles of modern courts in delineating the scope of First Amendment rights." (Moran v Hearst Corp., 40 NY2d 1071.)

It may be that some higher court will think that this case is a suitable vehicle to modify New York's common law of private defamation. Foreseeing that possibility, we exercise our power to review the facts (CPLR 5501, subd [c]; and see Time, Inc. v Firestone, 424 US 448) and find that there is evidence in the record sufficient to meet any predictable burden of proof, be it negligence, actual malice or some intermediate degree of fault.

CARDAMONE, J. (concurring). This is a libel suit between private individuals. With the several exceptions noted, we affirm the substantial jury verdicts awarded plaintiffs after a lengthy jury trial.

### STATEMENT OF THE CASE

The plaintiffs are Philip D. Rupert, Jr. (Rupert) and Rupert & Lutz Agency, Inc. (Rupert & Lutz), an insurance agency of which Mr. Rupert is president. The defendants are Charles J. Sellers, Jr. (Sellers) and Charles J. Sellers & Company, Inc. (Sellers & Co.), an insurance agency of which Mr. Sellers is president. The defendants appeal from a Monroe County Supreme Court verdict in favor of the plaintiffs, following a jury trial, and judgment in the amount of $575,842.53.

Rupert & Lutz was the administrator of the health and accident group plan of the Monroe County Medical Society

(Medical Society), a voluntary organization of physicians offering insurance to its members at reduced group rates. Continental Insurance Company (Continental) was and is the carrier of the group health and accident insurance plan. In March, 1971 the Medical Society changed administrators, naming Sellers & Co. in place of Rupert & Lutz to serve as administrators of the group plan. This lawsuit alleging libel and tortious interference with a contractual relationship concerns the circumstances surrounding the switching of the indorsement by the Medical Society from Rupert & Lutz to Sellers & Company.

Plaintiffs originally alleged six causes of action. Only two—the second and sixth—are the subject of this appeal, the others having been withdrawn, dismissed or no-caused. Plaintiffs' second cause of action claims that each was libeled in a March 10, 1971 letter from Charles J. Sellers to Donald M. Irish, then executive director of the Medical Society, but deceased at the time of the 1977 trial. Plaintiffs' sixth cause of action alleges that defendants Sellers and Sellers & Company commenced a systematic campaign to induce the Medical Society to terminate the society's written contractual relationshp with plaintiffs. With respect to the second cause of action, the jury returned verdicts in favor of Rupert individually for $22,000 special damages and $200,000 general damages and in favor of Rupert & Lutz Agency for $208,000 special damages and $1 general damages. In the same cause of action the jury further found that both plaintiffs were entitled to punitive damages. After hearing further proof on that issue, the jury returned a verdict for $1 punitive damages for Rupert and $1 punitive damages for Rupert & Lutz. With respect to the sixth cause of action, the jury rendered verdicts in favor of Rupert for $20,000 compensatory damages and for Rupert & Lutz in the amount of $1 compensatory damages. As to the sixth cause of action, the jury also found defendants liable for punitive damages in the amount of $1 for Rupert and $15,000 for Rupert & Lutz.

Rupert & Lutz had been the administrator of the Medical Society's group health and accident insurance program since 1945. Under the original plan doctors who were members of the Medical Society could enroll in a group disability plan cancelable at will by the insurance company. In 1968 Continental began offering a new, vastly different program the main feature of which was that it is guaranteed group renew-

able, that is, not cancelable at the option of the insurance company. Under the new program the older physician would be required to pay a substantially greater premium than under the old program. The younger physician, however, would pay substantially less. From 1968 to 1970 Rupert & Lutz conducted a voluntary conversion of the individual member doctors to the new program with most of the younger doctors converting and most of the older doctors electing to retain their existing coverage. Since the success of the individual voluntary conversion was mixed, the use of other alternatives such as voluntary or compulsory mass conversion was a distinct possibility. A voluntary mass conversion is a conversion of members on a mass basis with permission of the Medical Society, but without consent of the individual doctors. A compulsory mass conversion is accomplished when the insurance company unilaterally converts the existing policies to the new program without either the members' or the Medical Society's permission. Such compulsory mass conversion is more likely where the loss ratio gets too high. The loss ratio for the Medical Society was 56% in 1968; 50% in 1969; and 80% in 1970. This change in the loss ratio was due in large measure to payments made under an extended benefit rider as many of the older doctors were reaching the age when they began to experience covered losses.

It was under these circumstances that Rupert & Lutz requested a meeting with the Medical Society held on December 11, 1970 to discuss, among other things, the loss ratio. Rupert & Lutz recommended to the society that it voluntarily mass convert all of the policies. No dissatisfaction was expressed by the society with Rupert & Lutz at the December 11, 1970 meeting, nor in a subsequent letter from the then executive director of the society (Mr. Irish) to plaintiff dated January 19, 1971. In fact, it was not until March 24, 1971 that plaintiff was aware of any dissatisfaction that the Medical Society had with the services being provided by plaintiffs. In the meantime, and unknown to plaintiffs, defendant Charles Sellers, had also attended that same December 11, 1970 meeting at his own request and was present at a time other than when plaintiffs were. He testified that several days after the meeting Mr. Irish called him and told him about the meeting with plaintiffs. This prompted an exchange of correspondence between them.

The first letter from Mr. Irish to Sellers whether Sellers had

"any ideas who might be consultant" to impartially evaluate the society's alternatives. The letter asked Sellers to find someone with "no ax to grind" or "personal stake" in the matter. Mr. Sellers wrote a letter to the society dated December 28, 1970 explaining what plaintiffs' report of December 11, 1970 meant and suggested that he serve as "consultant". In the December 28 letter, after stating that "personal interests" have never been a problem for his office, Mr. Sellers begins his impartial evaluation by characterizing some of plaintiffs' recommendations to the society as "dangerous" and predicted "disaster" if the Medical Society followed plaintiffs' advice. Mr. Sellers appeared in person before the medical economics committee of the society on February 9, 1971 and explained his comments made in his December 28, 1970 communication. He testified that the doctors "didn't really get angry until he had explained" the comments. Later Sellers wrote on February 11, 1971, characterizing plaintiffs' letter of February 10, 1971 as having stated that Continental had issued an "ultimatum" that the doctors must be converted or they would be canceled. The correspondence from Sellers to the society continued by letter dated February 22, 1971 in which Mr. Sellers accused plaintiffs of a conflict of interest and on February 24 in which Sellers stated that Rupert & Lutz "has operated without capable leadership and this group has deteriorated". Subsequently Mr. Sellers wrote to Continental along the same lines. The matter culminated in the Sellers' letter of March 10, 1971 to the society which is the crucial evidence upon which plaintiffs' claim for libel is based.

In that letter Sellers stated that Rupert will "reluctantly go through the motions of a voluntary installation of guaranteed renewable policies". He goes on to state that Rupert needs many things to win back all the young physicians: "[T]here are so many things he needs and doesn't have to do the job that it would take me two pages to list them". Sellers then depicts a scenario where, with the society's loss ratio soaring, Continental demands rate increases at which time Sellers says "we can no longer rescue your Group". Further, he stated that plaintiffs "after getting nowhere for over two years", first tried to solve the problem by hiring McKendry & Associates. Rupert's purpose in retaining this insurance agency was to expand its marketing and sales force. However, Sellers characterized this arrangement as one that would create a "conflict of interest". Sellers characterizes Rupert's other solutions to

the problem facing the society as an "attempt to threaten you" and "to bluff you into compulsory premium increases". Referring to a letter from Continental to the society, defendant says that he doubts whether anyone would seriously believe that plaintiffs' "parade of blunders" is caused by any zeal on his part in behalf of the society. The Continental letter, Sellers avers, corrected plaintiffs' "threats and misstatements" regarding loss of coverage and automatic rate increases. In over two years, Sellers says, plaintiff has not succeeded in converting the loss ratio, his "[f]ailure is a proven fact" and although plaintiff has tried to "force you" into rate increases, "his threats and bluffs" have been called. Sellers concludes the letter by telling the society that their only solution is to transfer the busienss to him immediately. If the society acts now, "our office will make Herculean efforts to extricate you from your present precarious position".

Two weeks later the president of the Medical Society wrote Continental advising that it would retain Continental, but only if it recognized the society's indorsement from Rupert & Lutz to Sellers & Company. Four days later Continental wrote acknowledging the change of indorsement.

There remains only to add that approximately a year before, in December, 1969, Mr. Sellers had made a written offer to purchase Rupert & Lutz by purchasing the two-thirds interest of Mr. Lewis and Mr. Lutz in order to gain control, intending later to make an offer to the Ruperts. On March 26, 1971—two days after the society's termination—Rupert & Lutz received a letter from Sellers offering to buy its remaining professional group business. A "fast" decision was suggested so that the groups could be advised that they had been "sold" rather than speculating as to why Rupert & Lutz was no longer administrator for Monroe County Medical Society. Plaintiffs responded that its agency was not for sale. Both parties are still engaged in the same businesses as they were in 1970-1971.

At the trial Mr. Sellers conceded that at the time he assumed the role of impartial consultant he was not a registered consultant, but merely a licensed broker competing with plaintiffs. He conceded that he believed that once he got the Medical Society business that plaintiff Rupert would be more reasonable about selling his interest in the Rupert & Lutz Agency and at a more reasonable price. He admitted that after the transfer of the society's business to his agency he

went out and attempted to obtain group business from the Rupert & Lutz Agency by asking such groups to transfer their business to him. Further, he expressed his view to the Medical Society, subsequent to the transfer, that Rupert & Lutz was having money problems. He said he thought they were in financial difficulty, although he had no independent basis for so believing; but, nevertheless, he did not hesitate to so state in writing. The matters that he set forth in his original report of December 28, 1970 and in the letter of March 10, 1971 and the conditions and facts he stated emanated or originated in each case solely from Mr. Sellers himself.

### CONTENTIONS OF THE PARTIES

On appeal defendants argue that (1) the trial court's charge was constitutionally defective because it failed to include "fault" as required by *Gertz v Robert Welch, Inc.* (418 US 323); (2) the libel claim should have been dismissed as a matter of law as the allegedly libelous letter of March 10, 1971 was a statement of opinion only or, in the alternative, the trial court should have charged the jury that an opinion cannot be libelous; (3) it was error to submit the March 10, 1971 letter to the jury as it was qualifiedly privileged as a matter of law; (4) the tortious interference claim should have been dismissed as an attempt to avoid the running of the Statute of Limitations and the instructions to the jury on this claim were erroneous in failing to charge that plaintiffs must prove unlawful actions or malice on the part of defendants; (5) the damages awarded in the libel and tortious interference claims were unfounded and improper; (6) the trial court erred in refusing to charge that one Richard Gates was an interested witness, in admitting evidence of defendants' financial well-being, and in not marshaling the evidence; and, finally, (7) the award of prejudgment and compounded interest was erroneous.

Plaintiffs respond that *Gertz v Robert Welch, Inc.* does not apply to suits between private parties; that defendants failed to take exception to that part of the libel charge on the issue of fault and, in any event, the jury found actual malice. Plaintiffs further contend that the trial court properly charged and ruled on the other issues raised by defendants.

### I—GERTZ V. WELCH REQUIREMENT OF FAULT APPLIED TO THE FACTS AND CHARGE

The common law of libel in New York makes any libelous

written words published or concerning another which are false and tend to injure another's reputation and discredit that person in the estimation of the public. To make an article libelous per se the charge must impeach the honesty, virtue or character of the complaining party or expose that person to public hatred, contempt, ridicule or obloquy or injure the person in his business or occupation (1 Seelman, Law of Libel and Slander in State of NY, par 11, pp 10-11). Actions libelous per se are actionable without proof of special damages *(Mencher v Chesley,* 297 NY 94, 100); those not actionable per se, but *per quod,* must allege and prove special damages (34 NY Jur, Libel and Slander, § 3) which results in loss of pecuniary nature *(Bishop v New York Times Co.,* 233 NY 446, 452).

Damages have traditionally been awarded, depending on the purpose served, either as compensatory or punitive *(Crane v New York World Tel. Corp.,* 308 NY 470, 476). Where the purpose is reparation for injury sustained, the damages are categorized as compensatory. As such they may be either nominal or substantial. Further, compensatory damages in New York have been subdivided into two separate classifications: general, which are damages presumed to flow from the libelous act complained of and for which no proof was required; and special, which were damages actually caused by the act complained of and were the proximate consequence of it. Special damages, however, as distinct from general, needed to be pleaded and proved. Punnitive damages, also called exemplary, are a punishment imposed as a result of the publication of the libel *(Taylor v Church,* 8 NY 452, 460). This type of damages has long been recognized in New York. The first case permitting them was decided in 1808 *(Tillotson v Cheetham,* 3 Johns, 56, 64 [per KENT, Ch. J.]). But in order to return a verdict of punitive damages a jury must find actual malice, long-defined in New York as including personal ill-will or spite as well as a libel recklessly or willfully published (1 Seelman, Law of Libel and Slander in State of NY, par 330, p 438; Clark, New York Law of Damages, § 58; *Holmes v Jones,* 147 NY 59, 67).

On this ancient landscape with its encrusted complexities, *Gertz v Robert Welch, Inc.* (418 US 323, *supra)* cut a wide swathe uprooting and eliminating some concepts deeply embedded in the law of libel. The common-law doctrine of strict

liability and the concomitant doctrine of presumed damages were eliminated. Punitive damages are permitted only upon a demonstration that the standard set forth in *New York Times Co. v Sullivan* (376 US 254)—publishing the libelous statement with knowledge of falsity or reckless disregard for the truth—has been violated *(Gertz, supra,* pp 347, 349; *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199). Broad rules of general application were laid down in an attempt to reconcile State law with the competing constitutional interest commanded by the First Amendment *(Gertz, supra,* p 349). Even in private defamation suits, as here, liability for libel may not be imposed on a defendant without a finding of fault *(id.,* p 347). Plaintiffs who fail to prove malice as defined in *New York Times Co. v Sullivan* are restricted to compensation for actual injury *(id.,* p 349). Actual injury is not limited to out-of-pocket expense, but includes injury to reputation and standing in the community, humiliation and mental anguish *(id.,* p 350).

Thus, actual damages now replaces the term compensatory damages as heretofore used in New York. The type of injuries embraced within its two subdivisions—general and special—may now be recovered as actual damages, with the significant difference that the damages formerly recovered as general damages must now be supported by competent proof and may not be presumed to flow from the libelous publication *(Gertz, supra,* p 350).

In my view *Gertz v Robert Welch, Inc.* has application to a private defamation suit where, as here, the defendant is a nonmedia publisher. The rationale for the *Gertz* decision is the balancing of the "legitimate state interest underlying the law of libel [which] is the compensation of individuals for the harm inflicted on them by defamatory falsehood" (p 341) with the danger that punishment in damages for the defamatory falsehood "runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press" (p 340). The First Amendment imperatives are not for the protection of the media alone, but are to be accorded to the public generally *(Branzburg v Hayes,* 408 US 665; The Communicative Torts and the First Amendment, 48 Miss LJ 671, 698-699; The Evolving Law of Defamation: New York Times Co. v. Sullivan to Gertz v. Robert Welch, Inc. and Beyond, 6 Rut-Cam LJ 471, 511). The Supreme Court left it to the States to define an appropriate standard of liability *(Gertz,*

*supra,* p 347). The highest court of New York has held that to warrant recovery the private individual plaintiff "must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" *(Chapadeau v Utica Observer-Dispatch, supra,* p 199). Absent any suggestion to the contrary by the Court of Appeals, there is no reason to afford media defendants greater protection than private individuals sued for defamation. Further, as a practical matter and for reasons of logic, there is more consistency and simplicity where one uniform rule governs in defamatory falsehood litigation. Adopting varying rules dependent upon the identity of the parties, whether there is public interest of a public statement and the like will only reintroduce those complexities into the law of libel which *Gertz v Robert Welch, Inc.* swept away.

Defendants' argument that the trial court erred in charging liability without fault is without merit on the record before us. We reach this conclusion because we find that the trial court did charge that an award for punitive damages must be predicated upon a finding of actual malice and the jury returned a verdict for such damages for both plaintiffs.

Considered as a whole the charge instructs the jury that a finding of malice must be predicated upon a finding that the defendant acted in reckless disregard for the truth. This charge adequately satisfies the fault requirements of *Chapadeau v Utica Observer-Dispatch.*

Substantial and credible evidence exists in the record to support the jury's finding of malice. The totality of the onslaught was such that the jury could have found malice from the sheer number of misrepresentations. Defendant Sellers' extensive writings and conversations with the Medical Society and Continental plainly attacks the plaintiffs' professional and personal competence, their honesty, leadership of their own agency, the financial stability of the agency, and its relationship with other groups and the advice, counseling and service they had rendered to the Medical Society for a period of over 25 years. The letter of March 10, 1971 clearly libels plaintiffs in these respects. Undeniably persuasive to the jury was the fact that all these machinations were accomplished while Sellers held himself out as an independent consultant motivated by concern for plaintiffs when, in reality, as revealed at

the trial, he was acting covertly out of a desire to further his own business interests, keeping plaintiffs in the dark until it was too late for them to defend themselves.

## II—THE LETTER OF MARCH 10, 1971 AS A STATEMENT OF OPINION ONLY

The mixture of opinion and fact which the letter contains is well conveyed by the statement "[h]is [Rupert's] success is not a matter of conjecture. Failure is a proven fact. Your present loss ratio exceeds 80 percent". Since the letter of March 10, 1971 itself and defendant's testimony are all to the effect that Sellers had opinions backed up by hard facts and concrete evidence, the letter was not constitutionally protected as a statement of defendant Sellers' opinion. In our view the trial court correctly concluded as a matter of law that the March 10 letter was not constitutionally protected as a statement of opinion only (see *Gertz v Robert Welch, Inc., supra,* pp 339-340; see, also, *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 381, mot for rearg den 42 NY2d 1015, cert den 434 US 969).

## III—THE MARCH 10, 1971 LETTER AS PROTECTED BY A QUALIFIED PRIVILEGE

A bona fide communication made upon any subject matter by one person who has an interest, or in reference to which he has a duty, is privileged if made to another having a corresponding interest or duty. The privilege exists even though the duty is not a legal one, but only a moral or social duty; and, further, despite the fact that the communication contains incriminating matter which without the privilege would be actionable defamation *(Stukuls v State of New York,* 42 NY2d 272, 278-279; *Byam v Collins,* 111 NY 143, 150). However, a qualified privilege does not extend beyond the statement a writer makes, believing in good faith that such a statement is true, while in the performance of his duty *(Shapiro v Health Ins. Plan of Greater N. Y.,* 7 NY2d 56, 60-61; *Pecue v West,* 233 NY 316). Nor does the qualified privilege, as the term itself suggests, confer absolute immunity; it may be overcome by an evidentiary showing that the defamatory statements were motivated by malice, i.e., ill-will, personal spite or culpable recklessness or negligence. The court must determine whether the subject matter, defendants' interest in it and relation to it are such as to make the publication privileged,

i.e., whether the occasion is one to which the law accords the protection of a privilege *(Cheatum v Wehle,* 5 NY2d 585, 594).

There just is no qualified privilege to make a defamatory attack merely to protect one's business interest. An attack of this nature is not to be confused with the making of a privileged statement to others who share a common interest in the same property, business or business relationship *(Shenkman v O'Malley,* 2 AD2d 567, 577; see 35 NY Jur, Libel and Slander, §§ 97, 102). To escape liability, an otherwise libelous statement must be limited in scope to its purpose and made only on a proper occasion, in a proper manner, and to proper parties *(Triggs v Sun Print. & Pub. Assn.,* 179 NY 144; *Zirn v Bradley,* 268 App Div 1063, mots den 269 App Div 672; *Morton v Knipe,* 128 App Div 94). And the language of the communication itself may be so extravagant, vituperative or venomous as to destroy the privilege *(Green v Kinsella,* 36 AD2d 677).

The trial court submitted the question of the existence of a qualified privilege to the jury as a matter of fact. On balance it seems apparent that Sellers and the Medical Society had a common business interest. Nonetheless, even assuming that the jury found that a qualified privilege existed, they must also have found that the defendants' privilege was destroyed through malice or abuse in order to have reached a verdict in favor of the plaintiffs. Since the trial court correctly charged the jury on these issues and there is sufficient evidence to support its verdict, we conclude that defendant's contentions with respect to the March 10 letter enjoying a qualified privilege are without merit.

### IV—THE TORTIOUS INTERFERENCE CLAIM AS AN ATTEMPT TO AVOID THE STATUTE OF LIMITATIONS AND THE COURT'S INSTRUCTIONS ON THIS CAUSE OF ACTION

It is established law that plaintiff may not circumvent the one-year limitation period applicable to defamation actions by describing the tort as an injurious falsehood or an interference with economic relations *(Noel v Interboro Mut. Ind. Ins. Co.,* 29 NY2d 743, affg 31 AD2d 54; *Morrison v National Broadcasting Co.,* 19 NY2d 453). The tortious interference or inducing breach of contract claim (the sixth cause of action) is not being used here either to evade the Statute of Limitations or to put before the jury otherwise inadmissible evidence. Plaintiffs were entitled to have the jury consider this cause of

action as an alternative theory as a possible basis for recovery. However, plaintiff may have but a single recovery for a single harm sustained.

Defendants mistake the nature of the cause of action alleged by plaintiffs and submitted to the jury. It is clear that the charge taken as a whole instructs the jury concerning the inducement of a breach of contract. An action lies against one who intentionally and knowingly and without reasonable justification or excuse induces a breach of contract (32 NY Jur, Interference, § 19). The elements in a cause of action for inducing breach of contract are: (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) defendant intentionally procuring the breach of that contract; and (4) damages *(Israel v Wood Dolson Co.,* 1 NY2d 116). There is no longer any requirement that there be actual malice *(A. S. Rampell, Inc. v Hyster Co.,* 3 NY2d 369). Where the contract is terminable at will or upon notice, no cause of action lies for inducing termination of the contract so long as the termination is not accomplished by defendant's fraud, misrepresentation or other unfair conduct (32 NY Jur, Interference, § 22). The instructions given are consonant with the law on inducing breach of contract. Indeed, defendants concede that the instructions on interference with a contractual relationship are correct. That portion of the charge to which they objected is merely a continuation and a completion of the properly rendered inducing breach of contract charge.

### V—THE DAMAGES AWARDED IN THE LIBEL AND TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP CLAIMS

#### A—LIBEL CLAIM

The jury awarded plaintiff Rupert & Lutz $1 in general damages, $208,000 in special damages and $1 punitive damages in the libel claim. It awarded plaintiff Rupert individually $200,000 in general damages, $22,000 in special damages and $1 punitive damages on the libel claim.

Fixing the amount of damages in a libel action is peculiarly within the province of the jury, which is considered the supreme arbiter, and the court, if possible, should avoid invading that field *(Toomey v Farley,* 2 NY2d 71; *Kruglak v Landre,* 23 AD2d 758; 35 NY Jur, Libel and Slander, § 168). The amount ought not to be disturbed unless it is so manifestly unjust as to indicate that the jury reached its verdict

through passion, bias, prejudice rather than upon principles of sound discretion, considering circumstances in mitigation or aggravation (35 NY Jur, Libel and Slander, § 168). We conclude under such tests that the $200,000 general damages awarded to Rupert individually is not so shockingly excessive as to require us to disturb it.

However, there was no testimony as to special damages suffered by Rupert personally. The sole witness on behalf of plaintiffs testifying as to the measure of damages was Robert M. Morrison, who was qualified as an expert appraiser of insurance agencies and who testified as to the difference in market value of the Rupert & Lutz Agency before and after plaintiffs lost the Medical Society account. In the absence of testimony of Rupert's actual personal damages the jury's award of $22,000 to plaintiff Rupert individually is without support and must be reversed.

The jury awarded $208,000 special damages to Rupert & Lutz. The only evidence of special damages introduced by plaintiffs was the testimony of the same expert who based his opinion on damages upon his evaluation of the Rupert & Lutz financial and business records, none of which had been introduced into evidence.

In New York an expert ordinarily may not base an opinion on facts which he did not personally observe or which are not in evidence. Where cross-examination reveals that an expert's opinion is based on facts that are not in evidence, the opinion must be stricken (*Cassano v Hagstrom,* 5 NY2d 643, mot for rearg den 6 NY2d 882; *People v Keough,* 276 NY 141; *Smith v Squire Homes,* 38 AD2d 879). Recently, however, the Court of Appeals in *People v Sugden* (35 NY2d 453) outlined two exceptions to the rule stated in *People v Keough (supra).* The court held that an expert may be permitted to base an opinion on material not in evidence provided: (1) the data relied on is a kind ordinarily accepted as reliable by experts in the field; or (2) where the material does not so qualify, the expert may state his opinion where he is subject to full cross-examination at trial (*People v Sugden, supra,* pp 459, 461). The expert's opinion here was properly admitted under the first exception set forth in *Sugden* which permits an expert to testify as to his opinion where the opinion is based upon evidence outside the record, if the evidence relied upon is the kind of data ordinarily accepted as reliable by experts in the field. Further, defendants knew plaintiffs' theory of damages and had full

access through discovery or subpoena to these business records which are ordinarily relied upon as proof of market value of a business. Thus, we conclude that there exists a proper basis for the jury verdict of $208,000 special damages in favor of plaintiff Rupert & Lutz Agency.

Defendants' final argument, that the $208,000 special damages awarded to Rupert & Lutz is excessive, is without merit. Plaintiffs' expert testified that the "potential factor" was a large factor in his determination and loss of future income is a proper element in the measure of special damages. This testimony was not of a speculative nature and the jury determination based upon it should not be disturbed.

### B—TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP CLAIM

We agree that there is no basis in the record for the jury award of $20,000 compensatory damages to plaintiff Rupert individually in the interference claim. The only evidence of financial loss was Mr. Morrison's testimony as to the diminution in value of the Rupert & Lutz Agency and these damages were fully recovered in the $208,000 award to defendant Rupert & Lutz. There was no further evidence adduced by plaintiffs on the issue of damages to sustain a further award on the basis of financial loss to plaintiffs. This award must, therefore, be reversed.

Defendants further maintain that the jury verdict of $15,000 punitive damages in the interference claim was improper in that there was no showing of public injury. Concededly, there can be no award of punitive damages where there is no public injury *(Vinlis Constr. Co. v Roreck,* 27 NY2d 687, mot for rearg den 27 NY2d 1006; *American Electronics v Neptune Meter Co.,* 30 AD2d 117, republished at p 529). In New York punitive damages are recoverable in actions *ex delicto* where there exist ingredients of malice, fraud, oppression, insult, wanton or reckless disregard of plaintiff's rights or other circumstances of aggravation. Such damages are also recoverable for intentional torts committed wantonly or maliciously, and for interference with property rights where the damage results from malicious acts, knowingly and willfully committed, such as interfering with the free use of property or conspiring to injure one in his trade or business *(Le Mistral, Inc. v Columbia Broadcasting System,* 61 AD2d 491; *Oehlhof v Solomon,* 73 App Div 329; 14 NY Jur, Damages, § 180). The

right to carry on a lawful business is a property right *(Federal Waste Paper Corp. v Garment Center Capitol,* 268 App Div 230, 234, affd 294 NY 714). Since an award of this nature should not lightly be disturbed *(Nardelli v Stamberg,* 44 NY2d 500, 503-504), the $15,000 verdict for the intentional tort of inducing a breach of a contractual relationship should stand.

## VI—MISCELLANEOUS ALLEGED ERRORS

Briefly, with respect to defendant's contentions of miscellaneous errors, the trial court properly instructed the jury regarding interested witnesses. The several brief allusions to defendant's wealth served a legitimate purpose *(Rupert v Sellers,* 48 AD2d 265) and there was no abuse of discretion by the trial court in making only limited references to the facts in marshaling the evidence.

## VII—THE AWARD OF PREJUDGMENT AND COMPOUNDED INTEREST

The prejudgment interest on the $208,000 special damages awarded to plaintiff Rupert & Lutz and on the $22,000 special damages awarded to plaintiff Rupert was improperly awarded and must be reversed.

Allowance of interest is provided for in CPLR 5001, 5002 and 5003. Interest on a cause of action from the earliest ascertainable date the cause of-action existed until the verdict is rendered is permitted as a matter of right in all actions seeking to recover for property loss whether in contract or tort (CPLR 5001, subds [a] and [b]). CPLR 5001 essentially codified the common-law rules with respect to the award of prejudgment interest. Those long-settled rules had in this State distinguished between those classes of actions where interest is given as of right as part of the damages on the loss from the time of injury (e.g., trespass, replevin); those classes where interest from date of accrual is not recovered as of right, but may be granted in the discretion of the jury according to the circumstances of the case (e.g., injuries to property through negligence); and classes of actions sounding in tort where no interest is allowed from the date of the injury until the verdict (e.g., assault and battery, libel, slander, false imprisonment and the like) *(Wilson v City of Troy,* 135 NY 96, 105; see, also, *Flamm v Noble,* 296 NY 262, 268). The Law Revision Commission comments on the predecessor statute to

CPLR 5001 (Civ Prac Act, § 480) make it clear that this statute does not change the traditional common-law rules with respect to tort actions, other than those for violation of property rights (1950 Report of NY Law Rev Comm., p 101).

We conclude, therefore, that absent a controlling precedent or legislative enactment there should be no allowance of interest from time of injury to the date of the verdict in this libel action. Interest on the verdict until judgment (CPLR 5002) and interest from the date of the entry of the judgment until payment (CPLR 5003) is, of course, recoverable (Siegel, New York Practice, § 411, p 544). Finally, the award of compound interest is also improper (*Levine v U. N. Cleaners,* 4 AD2d 955; *Matter of Schuster,* 167 Misc 194, mod other grounds 257 App Div 55, affd 284 NY 569; 2 Clark, New York Law of Damages, § 898).

Accordingly, the judgment should be modified and, as modified, it should be affirmed.

DILLON and HANCOCK, JR., JJ., concur with SIMONS, J.; CARDAMONE, J., concurs in a separate opinion; MOULE, J. P., not participating.

Judgment modified, on the law and facts, and, as modified, affirmed, without costs.