**J & J SHEET METAL WORKS, INC., Plaintiff,**

v.

**Anthony PICARAZZI, Defendant.**

**No. 90–CV–118.**

United States District Court, N.D. New York.

May 19, 1992.

Twining, Nemia, Hill & Steflik, Binghamton, N.Y. (Joseph J. Steflik, of counsel), for plaintiff.

Blitman & King, Syracuse, N.Y. (James R. Lavaute, Douglas L. Steele, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

HOWARD G. MUNSON, Senior District Judge.

Presently before the court is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. The court heard oral argument on October 11, 1991 in Syracuse, New York. For the reasons stated below, the court grants defendant's motion.

## I. BACKGROUND

This case arises out of three letters written by defendant Anthony Picarazzi, business manager for the Sheet Metal Workers International Association, Local No. 112 ("Local 112"), located in Ithaca, New York. The subject of each of the letters was the ongoing renovation of the West Hill Fire Department in Ithaca, New York. Defendant addressed two of the letters to Egner Associates, the architects of the West Hill project, and the third letter to the City of Ithaca Purchasing Department ("the City"). He stated in each of the letters that the work being done by plaintiff, J & J Sheet Metal Works, Inc. ("J & J"), on the

West Hill renovation was sub-par. The allegations were based on personal observations defendant made of the work site. Two of the letters, specifically the first letter sent to Egner Associates [1] and the letter sent to the City [2], were written on Local 112 stationary and were signed by defendant in his capacity as business representative. Defendant styled his second letter to Egner Associates as a letter from a concerned taxpayer.[3]

1. In its entirety, the November 30, 1989 letter to Egner Associates reads as follows:

"On the City of Ithaca Fire Department, project # 8738/8742/8743/8744, the prevailing wage for a sheet metal worker is $22.43 per hour.

"A sheet metal journeyman is paid this wage because after 5 years of school and hands on training, he develops neatness, accuracy and speed through the following skills:
   1. technical knowledge
   2. hand skills
   3. planning
   4. judgement

"J & J Sheetmetal of Vestal, N.Y. (a sub contractor of James Lewis Inc.), is performing the sheet metal work on this project.

"After a job site visit on November 29, 1989, I have come to realize the men installing this project have none of the skills listed above. Holes are being knocked in new walls because of a lack of preplanning. The installation itself in my opinion could not have been performed by qualified sheet metal workers. It is the sloppiest installation I have seen in my 15–year career.

"I can not understand how any customer, contractor or N.Y.S. can justify paying the installers of this project a sheetmetal worker's wage.

"As a result, I am making a formal request under the freedom of information act 5 U.S.C. 552. I am requesting copies of the certified payroll records for J & J SheetMetal. J & J is the subcontractor for James Lewis, Inc., the H.V.A.C. contractor on the Ithaca Fire Department, project # 8738/8742/8743/8744. I am requesting all certified payroll records submitted by J & J, whether they are in your possession, with the contractor, owner or other agencies. I am also requesting copies of Apprentice Registration Forms for J & J SheetMetal and the applicable prevailing wage determination established by the Department of Labor for this project.

"I understand there might be a fee for this but I feel that the release of these records will benefit the general public and therefor there should be no charge. If there will be a fee, please inform me before you fill the request.

"I am aware that the law provides for penalties for anyone who arbitrarily or capriciously withholds records. If any part of my request is denied, please give me all the records to which you feel I am entitled. Please also tell me the exact reason for the denial and tell me to whom I may appeal.

"I look forward to hearing from you within 10 days as required by law.

"Sincerely, Anthony Picarazzi. Business Representative."
Exhibit ("Exh.") A attached to Document ("Doc.") 8.

2. Defendant's December 18, 1989 letter to the City states:

"In reference to the Ithaca Fire Department Project # 8738/42/43/44, I have some legitimate concerns that were expressed to Egner Associates through correspondence on 11/29/89 and 11/30/89.

"Unfortunately, the Architect disclaims responsibility for this project, as expressed in the enclosed copy of a 12/6/89 reply letter.

"I represent in excess of 300 members who pay N.Y.S. taxes and many of whom live in the Ithaca area.

"As the Contracting Agency, I am holding you directly responsible for the expenditure of the N.Y.S. funds allotted to your project.

"I would appreciate an investigation into the quality of work performed by J & J Sheetmetal. Violations have been listed in attached correspondence.

"I would also request a written outcome as well as any subsequent action arising from this request.

"Please be advised, I am ready to involve City, State and Federal Legislation to clear the air on this issue.

"Sincerely, Anthony Picarazzi. Business Representative."
Exh. C attached to Doc. 8.

3. In its entirety, the letter of December 4, 1989 to Egner Associates reads as follows:

"On November 29, 1989, I made a job visit to the West Hill Fire Department project in Ithaca, N.Y., Project # 8738/8742/8743/8744.

"I would like to make a formal complaint on the following items.
   1. There are galvanized hangers on aluminum duct (when dissimilar metals are in contact a electrolytic reaction takes place causing corrosion)
   2. Galvanized screws are used to connect aluminum duct
   3. Aluminum or galvanized duct is resting on a copper water line in 2 places, again causing a electrolytic reaction and also denies insulation in these spots.
   4. There is an excessive amount of flexible duct
   5. Duct is not properly hung
   6. Galvanized damper hardware is used on aluminum duct

"If you would like, I will make myself available to point out these violations.

Plaintiff commenced the present action on January 10, 1990 in New York State Supreme Court, Broome County, alleging three claims of libel and one claim of tortious interference with contractual relations. The first cause of action for libel is based on the following passage from defendant's first letter to Egner Associates dated November 30, 1989:

A sheet metal journeyman is paid this wage because after 5 years of school and hands on training, he develops neatness, accuracy and speed through the following skills:

1. technical knowledge
2. hand skills
3. planning
4. judgement

J & J Sheetmetal of Vestal, N.Y. (a sub contractor of James Lewis Inc.), is performing the sheet metal work on this project.

After a job site visit on November 29, 1989, I have come to realize the men installing this project have none of the skills listed above. Holes are being knocked in new walls because of a lack of preplanning. The installation itself in my opinion could not have been performed by qualified sheet metal workers. It is the sloppiest installation I have seen in my 15–year career.

I can not understand how any customer, contractor or N.Y.S. can justify paying the installers of this project a sheetmetal worker's wage.

Plaintiff's Complaint, at ¶ 5.

The second cause of action for libel is based upon the following portion of defendant's December 5, 1989 letter to Egner Associates:

I personally have never seen such a blatant disrespect for knowledge and craftsmanship in the Sheet Metal Industry. I would not expect to find this

many violations on a ten story building that I found on approximately 40′. of ductwork.

Plaintiff's Complaint, at ¶ 15.

Plaintiff's third cause of action for libel is directed at the following excerpt of defendant's December 18, 1989 letter to the City of Ithaca Purchasing Department:

I would appreciate an investigation into the quality of work performed by J & J Sheetmetal. Violations have been listed in attached correspondence.

I would also request a written outcome as well as any subsequent action arising from this request.

Please be advised, I am ready to involve City, State and Federal Legislation to clear the air on this issue.

Plaintiff's Complaint, at ¶ 23.

Defendant filed a notice of removal on January 30, 1990, asserting that federal labor law violations provided a basis for federal question jurisdiction. Plaintiff's motion for remand was denied by the court in a bench decision rendered April 20, 1990. Defendant brought the present motion for summary judgment on August 23, 1991.

Defendant claims that the statements made in the three letters were purely opinion, and thus protected speech under the United States Constitution as well as the New York State Constitution. Defendant also argues that, even if the statements were factual in nature as plaintiff claims, they are not actionable because plaintiff is a public figure and/or the letters involved a labor dispute, both of which require a showing of actual malice to be actionable. Lastly, defendant contends that plaintiff has failed to state a cause of action for tortious interference of contract.

Plaintiff opposes the summary judgment motion on the ground that the statements of defendant constitute libel per se. In the

---

"I personally have never seen such a blatant disrespect for knowledge and craftsmanship in the Sheet Metal Industry. I would not expect to find this many violations on a ten story building that I found on approximately 40′ of ductwork.

"Since I am a tax payer in New York State and New York State is funding this job. I would request a decision on these complaints

and would hope my tax monies are spent wiser in the future.

"If these violations are not resolved, please inform me to whom I may appeal.

"Thanking you in advance for your cooperation.

"Sincerely, Anthony Picarazzi."

Exh. B attached to Doc. 8.

alternative, if defendant's statements are found to be opinions, they still constitute libel because they were based upon false facts. Furthermore, the actual malice standard is inappropriate in the case at bar, according to plaintiff, because plaintiff is not a public figure and the letters do not involve a labor dispute; even if the standard applies, plaintiff asserts that actual malice is shown because defendant made the statements knowing they were false. Lastly, plaintiff contends that it has met its burden of showing that defendant tortiously interfered with the contract between plaintiff and the West Hill contractor.

## II. DISCUSSION

The principles guiding consideration of a motion for summary judgment are well settled. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In cases where the moving party does not bear the ultimate burden of proof on an issue, such as in the case at bar, that party satisfies its summary judgment burden by "point[ing] to the absence of evidence to support an essential element of the non-moving party's claim." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988). When the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). To avoid the entry of summary judgment, the opposing party must prove that the factual dispute is genuine, in that a reasonable jury could return a verdict for either party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, a district court "must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Co.*, 892 F.2d 1128, 1132 (2d Cir.1989).

With these rules in mind, the court will address the arguments presented on defendant's motion for summary judgment. Defendant contends that his statements concerning the work done by J & J were merely his personal opinion and that he never held them out to be the truth, and thus the statements are protected speech under the United States Constitution and New York State Constitution. Defendant focuses his argument on the protection afforded by New York law, citing extensively from *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 501 N.E.2d 550, 508 N.Y.S.2d 901 (1986), which has been described as "furnish[ing] the operative standard in this state for separating actionable fact from protected opinion." *Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 567 N.E.2d 1270, 1280, 566 N.Y.S.2d 906, 916 (1991), *cert. denied*, —— U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). Based on the four-part test laid down in *Steinhilber*, defendant contends that his statements constitute protected speech, and thus are not actionable for libel.

Plaintiff, on the other hand, argues that defendant's statements that J & J is not competent to perform its work, that it charges excessive fees, and that it is generally unfit, constitute libel per se. Alternatively, plaintiff argues that defendant's statements, even if they are considered opinions, are based on false facts and are therefore actionable under the recent Supreme Court holding in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

■ J & J's defamation claims are subject to whatever protection the First Amendment of the United States Constitution, as well as the New York Constitution, might provide. The level of protection provided by the United States Constitution to statements of opinion was the subject of a 1990 Supreme Court opinion, in which the Court held that the First Amendment contains no "wholesale defamation exemption for anything that might be labeled 'opinion'." *Milkovich*, 110 S.Ct. at 2705. In a recent opinion reconsidering a New York Court of Appeals case in light of *Milko-*

*vich,* however, the New York Court of Appeals stated that a separate and independent privilege exists under the New York State Constitution that is "often broader than the minimum required by the Federal Constitution." *Immuno,* 77 N.Y.2d at 249, 567 N.E.2d at 1278, 566 N.Y.S.2d at 914.

■ Under a federal constitutional analysis, the court must first determine whether the challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact. *Milkovich,* 110 S.Ct. at 2707. Statements that are factual in nature, or statements of opinion which relate to matters of public concern and that reasonably imply false and defamatory facts, are generally subject to state libel laws. *Id.* at 2706–07. In such cases, the complaining party must demonstrate "that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Id.* at 2707. Whether the statements constitute protected opinion is a question of law for the court to decide. *Letter Carriers v. Austin,* 418 U.S. 264, 282, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745 (1974). The question must be answered on the basis of what the average person hearing or reading the communication would take it to mean. *See Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 224, 227–28 (2d Cir.1985).

■ Reviewing the offending portion of defendant Picarazzi's first letter, dated November 30, 1989, it is clear that the letter has some factual grounding. In particular, the truth or falsity of the statement that J & J employees lack "technical knowledge" can be determined from a review of the workers' educational background and work experience. It is also possible to factually verify whether "holes [were] being knocked in new walls," as Mr. Picarazzi claims.

With regard to the second letter written by defendant on December 4, 1989, the letter states that J & J employees show "a blatant disrespect for knowledge and craftsmanship in the sheet metal industry." Again, this statement can be factually veri-

fied by reviewing the training records of J & J employees.

Lastly, defendant Picarazzi's letter of December 18, 1991 states that "I would appreciate an investigation into the quality of work performed by J & J SheetMetal. Violations have been listed in attached correspondence." Clearly this excerpt, as well as the other statements highlighted above, is not "the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining" that the work done by J & J was inadequate. *Milkovich,* 110 S.Ct. at 2707. The court finds that a reasonable factfinder could conclude that the statements in the letters written by defendant imply that plaintiff was doing an inadequate job on the West Hill project. *Id.* The letters are restrained, and it appears that the statements are seriously maintained. Thus, to the extent that the letters contain defamatory factual statements about plaintiff, they are actionable if the facts are false.

■ Plaintiff must next satisfy its burden of proving that the factual assertions are actually false. *See Milkovich,* 110 S.Ct. at 2704; *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986). In other words, plaintiff must raise a triable issue of fact as to the falsity of at least one of the threshold factual assertions in the letters in order to avoid summary judgment. *Id.*

The court finds that plaintiff has alleged sufficient facts to call into question the validity of several statements in defendant's letters. To refute defendant's assertions that the installation work "could not have been performed by qualified sheet metal workers," that J & J employees lacked "technical knowledge, hand skills, planning and judgement," and that the workers showed a "blatant disrespect for knowledge and craftsmanship," plaintiff offers a description of the vocational and educational backgrounds of the ten workers employed on the West Hill project. Affidavit of Ralph Azersky, Doc. 11, at ¶ 7. Also offered by plaintiff is the affidavit of

Michael Azersky, Vice President of J & J and past chairperson of Southern Tier Sheet Metal Contractors Apprentice Training Program, stating that seven of the ten employees working on the West Hill project graduated from either the Southern Tier training program or Local 112 apprentice training program. Affidavit of Michael Azersky, Doc. 12, at ¶ 7. Mr. Azersky categorically denies the allegation in defendant's November 30 letter that "holes are being knocked in new walls because of lack of preplanning." *Id.* Without further discovery to show whether the work at the West Hill project was sub-par by industry standards, or whether the workers were properly trained, the court cannot find that the statements contained in defendant Picarazzi's letters are unquestionably true. *See Immuno,* 77 N.Y.2d at 241, 567 N.E.2d at 1273, 566 N.Y.S.2d at 909 (court granted summary judgment after the parties completed *"extensive* discovery") (emphasis added). Since there are material issues of fact in dispute between the parties, the court denies summary judgment under the standard set forth in *Milkovich.*

Under a New York State law analysis, the court reaches the same conclusion that it did under *Milkovich.* The New York Court of Appeals, in its 1986 *Steinhilber* decision, adopted a four factor test developed in *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), for determining whether statements of opinion are protected speech. *Steinhilber v. Alphonse,* 68 N.Y.2d at 292, 501 N.E.2d at 554, 508 N.Y.S.2d at 905–06. Under this test, the court must first examine the content of the whole communication, as well as its tone and apparent purpose, to determine whether a reasonable person would view it as expressing or implying facts. *Immuno,* 77 N.Y.2d at 254, 567 N.E.2d at 1281, 566 N.Y.S.2d at 917; *Steinhilber,* 68 N.Y.2d at 293, 501 N.E.2d at 555, 508 N.Y.S.2d at 906.

The portion of defendant's November 30, 1989 letter to Egner Associates that plaintiff claims is factually laden precedes a request by defendant to obtain copies of plaintiff's employment records under the Freedom of Information Act. The portion of defendant's December 4, 1989 letter to Egner Associates that plaintiff claims is factually laden is preceded by a statement which explains in technical terms the problems defendant sees with the site, and is followed by a statement that requests a decision on defendant's complaints. The portion of defendant's December 18, 1989 letter to the City that is allegedly factually laden is preceded by a statement highlighting the concerns defendant has with the West Hill project and his intent to hold the City of Ithaca Purchasing Department directly responsible for the expenditure of funds.

The alleged factual statements are set in the context of straight forward and direct language discussing specific problems at the West Hill site and the need to have them redressed; there is no attempt at invective or humor in any of the statements. *See Steinhilber,* 68 N.Y.2d at 293, 501 N.E.2d at 555, 508 N.Y.S.2d at 906 (tape recorded message found to be protected speech in part because evident that it was intended to be invective, expressed in the form of heavy-handed and nonsensical humor). Because of the straight forward presentation and the specificity with which defendant sets forth the problems in his letters, the court concludes that the statements' verbal context suggests to the ordinary reader that the comments were intended to be understood as assertions of fact.

The last two factors that the court must consider under New York law are the particular circumstances surrounding the drafting of the letters and the broader social context of the communication, including the existence of any applicable customs or conventions which might "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Steinhilber,* 68 N.Y.2d at 292, 501 N.E.2d at 554, 508 N.Y.S.2d at 905. Review of these two factors confirms the conclusion that the letters would be taken by the ordinary person literally, and not figuratively. Although the letters include phras-

es such as "in my opinion", "I personally have never seen", and "I would not expect", the court does not believe that the letters give the general impression that they are opinion. They are specifically premised upon a personal on-site visit defendant made of the West Hill project. Defendant thereby implies that his opinion is based upon facts known to him, but unknown to Egner Associates or the City of Ithaca Purchasing Department. This, in turn, converts his assertions to "mixed opinion", which are actionable. *See Sweeney v. Prisoners' Legal Services of New York, Inc.,* 146 A.D.2d 1, 5, 538 N.Y.S.2d 370, 372 (3d Dep't), *appeal dismissed,* 74 N.Y.2d 842, 545 N.E.2d 872, 546 N.Y.S.2d 558 (1989) (citations omitted). In addition, specific and technical language was used by defendant in his letters to describe problems and concerns he discovered on his visit. Terms such as "galvanized hangers", "electrolytic reaction", and "damper hardware" clearly lack ambiguity, and are terms that the reader as an architect would be fully familiar with. Based on these facts, the third of the four *Ollman* factors relating to the particular circumstances of the communication indicates that the statements are actionable fact.

Looking at the fourth factor, the "broader social context," one circumstance that might signal to the average reader that the statements were merely invective or opinion is that defendant's employer, Local 112, was in the midst of a unionizing campaign against plaintiff. *See Steinhilber,* 68 N.Y.2d at 294–95, 501 N.E.2d at 556, 508 N.Y.S.2d at 906–07. *Steinhilber* presented a similar situation from which the court can draw guidance in analyzing this factor. In *Steinhilber,* a union member continued working during a strike in direct violation of a strike order and union rules. *Id.* at 287, 501 N.E.2d at 551, 508 N.Y.S.2d at 902. Union officials responded to this infraction by recording a telephone message which played automatically to anyone dialing the private telephone number provided to union members. *Id.* The message referred to this union member as a "scab" and stated that she lacked talent, ambition, and initiative. *Id.* In the ensuing def-

amation suit by this worker, the union defended its actions by arguing that its statements were purely opinion and thus protected under New York state law. The New York Court of Appeals, in reviewing the fourth factor of the *Ollman* test, held that "even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an 'audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole.'" *Id.* at 294, 501 N.E.2d at 556, 508 N.Y.S.2d at 907 (quoting *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (9th Cir.1980)).

While the record in the case at bar indicates that a unionizing campaign was being waged against plaintiff by Local 112 at the time defendant drafted and sent his letters in late 1989, Defendant's Memorandum of Law, Doc. 9, at 2, the court does not find the *Steinhilber* analysis dispositive on this issue. In *Steinhilber,* the alleged defamatory statements were made to union members who were fully aware both of the existence of the strike and that the recorded message was part and parcel of the strike. Conversely, there is no evidence in the present case that Egner Associates and the City of Ithaca Purchasing Department were aware of the unionizing campaign at the time defendant's letters were drafted. They only became aware of the campaign after the letters were received. As such, the recipients had no way of knowing the context in which the letters were written until after they had read and acted upon them. *See* Letters to James L. Lewis, Inc., Exhs. D & E attached to Doc. 8. Thus, the fourth factor of the *Ollman* test also suggests that the statements are actionable.

In sum, application of the four *Ollman* factors indicates that defendant's statements are actionable as statements of fact, and the court therefore concludes that defendant's statements are not protected speech under New York law. Defendant's motion for summary judgment on the ground that the statements contained in

the three letters are protected opinion is denied.

■ Having determined that the alleged libelous statements can be construed as statements of actionable fact, the court must next consider whether plaintiff is entitled to recover damages under New York law. In *Chapadeau v. Utica Observer–Dispatch*, the New York Court of Appeals held that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition," the defamed party must establish "that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by reasonable parties" in order to recover damages. *Chapadeau v. Utica Observer–Dispatch*, 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y.S.2d 61, 64 (1975). *See Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 345, 465 N.E.2d 802, 803, 477 N.Y.S.2d 82, 83 (1984). Defendant argues that the expenditure of public monies is clearly a matter of public concern. By contrast, plaintiff asserts that the mere fact that it is a private corporation performing work on a publicly funded project is not sufficient to prove that the letters were within the sphere of legitimate public concern.

Before applying the principles set forth in *Chapadeau*, the court must first determine whether *Chapadeau* even applies to a defamation case such as this, where the defendant is not a member of the media and a public medium was not used for publication of the defamatory matter. Although the New York Court of Appeals has not yet addressed this issue, *see Sweeney v. Prisoners' Legal Services of New York, Inc.*, 146 A.D.2d 1, 6, 538 N.Y.S.2d 370, 373 (3d Dep't 1989); *Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 16, 486 N.Y.S.2d 11, 16 (2d Dep't 1985), *aff'd on other grounds*, 67 N.Y.2d 778, 492 N.E.2d 125, 501 N.Y.S.2d 17 (1986); *Rupert v. Sellers*, 65 A.D.2d 473, 483, 411 N.Y.S.2d 75, 81 (4th Dep't 1978), *aff'd on other grounds*, 50 N.Y.2d 881, 408 N.E.2d 671, 430 N.Y.S.2d 263 (1980), *cert. denied*, 449 U.S. 901 (1980), at least one federal court has applied the *Chapadeau* rationale to a non-media defendant who did not use a public medium to disseminate the defamatory material. *See McNally v. Yarnall*, 764 F.Supp. 838, 847–48 (E.D.N.Y.1991) (*Chapadeau* standard applied to art historian and museum that wrote defamatory letters). The rationale for such a decision was succinctly expressed in an earlier decision by then-Justice Cardamone of the Fourth Department, in his concurring opinion in *Rupert*: "[a]bsent any suggestion to the contrary by the Court of Appeals [in *Chapadeau*], there is no reason to afford media defendants greater protection than private individuals sued for defamation. Further, as a practical matter and for reason of logic, there is more consistency and simplicity where one uniform rule governs in defamatory falsehood litigation." *Rupert*, 65 A.D.2d at 483, 411 N.Y.S.2d at 81. *See McGill v. Parker*, 179 A.D.2d 98, 582 N.Y.S.2d 91, 97 (1st Dep't, 1992) ("There is no reason … why the Constitution should be construed to provide greater protection to the media in defamation suits than to others exercising their freedom of speech"). The court adopts the rationale of Justice Cardamone in *Rupert* and finds that the standard enunciated in *Chapadeau* is applicable to non-media defendant Picarazzi.

■ In applying *Chapadeau*, the court must first determine whether defendant's letters involved a matter of public concern. The Supreme Court has held that "[w]hether … speech addresses a matter of public concern must be determined by [the expression's] content, form, and context … as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). Examining the record in the instant case, the court finds that defendant's letters are "arguably within the sphere of legitimate public concern," and "reasonably related to matters warranting public exposition." *Chapadeau*, 38 N.Y.2d at 199, 341 N.E.2d at 571, 379 N.Y.S.2d at 64. The statements

made by defendant Picarazzi in his letters concern the alleged waste of monies on a publicly funded renovation project. The December 4, 1989 letter is styled as a letter from a concerned taxpayer, while the December 18, 1989 letter implies that it was written on behalf of "300 members [of Local 112] who pay N.Y.S. taxes and many of whom live in the Ithaca area." Exhs. B & C attached to Doc. 8. Because the misappropriation of public monies is a subject about which the general public would take an interest, the content, form, and context of defendant's letters support his argument that the issue is one of public concern.

The next issue to be decided under *Chapadeau* is whether plaintiff has shown that defendant conducted and reported the results of his on-site visit in a "grossly irresponsible manner." Plaintiff contends that defendant made the defamatory statements regarding the training, skill, and craftsmanship of the individuals employed by J & J at the West Hill site "with a high degree of awareness of their probable falsity." This accusation is premised on the fact that Mr. Picarazzi wrote the offending letters, which imply that J & J's employees lack proper training, even though he "personally trained many of the individuals working on the West Hill Fire Department project." *See* Plaintiff's Memorandum of Law, Doc. 13, at 9. Defendant argues that plaintiff's allegation that he knew who was employed at the West Hill project is false, and is merely an attempt by plaintiff to create a material issue of fact were none exists. Defendant contends that he did not know who was employed by J & J on the project because no workers were present at the work site when he made his inspection.

Based on a careful review of the record, the court finds that there are insufficient facts from which a jury could find that defendant had substantial reason to doubt the accuracy of the disputed portions of his letters and that he acted in a "grossly irresponsible manner" by printing the in-

formation. Although J & J claims that defendant personally trained "half" or "many" of the individuals working on the West Hill Fire Department project, its own description of the vocational and educational background of its employees indicates that only one employee was personally trained by defendant Picarazzi. Affidavit of Ralph Azersky, Doc. 11, at 3–4. Furthermore, there is no evidence in the record indicating that defendant Picarazzi saw J & J's employees when he visited the West Hill site. In sum, "even if [defendant Picarazzi's statements] are ultimately capable of being proved false, such statements were not made with the requisite gross irresponsibility to allow the award of damages." *McNally*, 764 F.Supp. at 848.[4] Therefore, defendant's motion for summary judgment dismissing plaintiff's three libel causes of action is granted.

■ The last issue for the court to decide is whether J & J states a cause of action for interference of contract sufficient to defeat defendant's motion for summary judgment on that issue. Plaintiff's fourth cause of action alleges that defendant published the letters at issue "with the intent to induce or force the contractor to breach its subcontract with the plaintiff, J & J." Defendant contends that because the contract between J & J and the contractor was never breached, J & J fails to state a valid cause of action. Defendant cites a number of cases standing for the proposition that "[i]n order for the plaintiff to have a cause of action for tortious interference of contract, ... there must be a breach of that contract by the other party." *Jack L. Inselman & Co. v. F & B Financial Co.*, 41 N.Y.2d 1078, 1080, 364 N.E.2d 1119, 1120, 396 N.Y.S.2d 347, 349 (1977) (citations omitted); *see also Baylis v. Mariott Corp.*, 906 F.2d 874 (2d Cir.1990); *Hartford Fire Ins. Co. v. Federated Department Stores, Inc.*, 723 F.Supp. 976 (S.D.N.Y.1989). Plaintiff, on the other

---

**4.** Because the court finds that plaintiff is not entitled to the award of damages under *Chapadeau*, it does not reach defendant's alternative argument that plaintiff is entitled to recover only nominal damages under *Linn v. Plant*

*Guards, Local 114*, 383 U.S. 53, 64–65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

hand, contends that even where there is no actual breach, the plaintiff may show wrongful interference with contract. *See S & S Hotel Ventures, Ltd. v. 777 S.H. Corp.*, 108 A.D.2d 351, 354, 489 N.Y.S.2d 478, 480 (1st Dep't 1985); *Goodall v. Columbia Ventures, Inc.*, 374 F.Supp. 1324, 1332 (S.D.N.Y.1974).

After reviewing the applicable case law, the court concludes that J & J has failed to state a cause of action for tortious interference of contract and therefore defendant is entitled to summary judgment on the fourth cause of action. Although the case law is somewhat muddled on this point, the New York Court of Appeals has clearly stated that "for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party." *Jack L. Inselman & Co.*, 364 N.E.2d at 1120, 396 N.Y.S.2d at 349. The Second Circuit recently acknowledged that principle in *Baylis v. Mariott Corp.*, 906 F.2d at 874, when it held that "under traditional principles of New York law, a party may not recover for tortious inducement of breach of contract without proving that the underlying contract has been breached." Plaintiff did not allege that the contract it had with the architects and general contractor was ever breached, so there is no material issue of fact upon which the parties disagree so as to preclude summary judgment on this cause of action.

## III. CONCLUSION

In summary, the court grants defendant's motion for summary judgment in its entirety. The clerk of the court is directed to enter judgement in favor of defendant.

It is So Ordered.