OPINION OF THE COURT
Kenneth R. Fisher, J.
Defendants Gannett and the City of Rochester separately move for summary judgment dismissing plaintiff’s defamation complaint. Previous motions for summary judgment by Gannett, and to dismiss the complaint pursuant to CPLR 3211 by the City, resulted in a denial by the Appellate Division. (Lee v City of Rochester, 195 AD2d 1000 [4th Dept 1993].) After discovery, summary judgment is sought again upon somewhat different grounds than those raised on the prior motions. For the reasons stated below, defendants’ motions are granted.
A. Background
On June 13, 1991, an article appeared on the front page of the Rochester Times-Union, owned by Gannett, which described a shooting spree the night before at a downtown dance club. According to the article, a lone gunman "sprayed” the club with gunfire, injuring nine people before he fled. Brief accounts of the victim’s injuries were provided in the article, which quoted Rochester Police Captain Paul Chechak of the Clinton Section on a few particulars of the crime. The owner of the *766 club, not the plaintiff, was quoted in explanation of the busy weeknight business of the club and her procedures for admittance of patrons over age 25 on those weeknights.
Buried in the middle of this brief account of the shooting spree was a three-sentence paragraph which gave a cryptic account of the club’s prior history. The first sentence stated that the club "has been open since December.” The second sentence stated that the club was closed "four years” ago "because of a drunken-driving accident in which the former owner lost his liquor license.” The third sentence stated that the club closed according to current practice at 1:30 a.m., and that it "used to be called Cisco’s.”
Plaintiff alleges without contradiction that he was the "former owner” and that he was widely known in the community as "Cisco”. He alleges that the reference to "a drunken-driving accident” as the cause of his loss of a liquor license was false. In fact, there was a 15-day suspension of the liquor license, but that occurred solely because of plaintiff’s possession of an unregistered firearm, not by reason of any drunken-driving accident. Moreover, although there was a hit-and-run accident in 1979, which provoked a City hearing in connection with plaintiffs amusement license, no real evidence of a connection between the accident and Cisco’s came out at the hearing. The accident occurred a block away, and involved a victim who never, according to plaintiff (and this fact is disputed by defendants), patronized Cisco’s. The amusement license was suspended 15 days in 1980, because of, as plaintiff contends, an allegedly racist police officer’s testimony that the Cisco’s establishment caused undue traffic congestion. No party contends that any public controversy attended the suspension, or indeed that any news coverage occurred. Plaintiffs charge of racism evidently is made for the first time in the context of this proceeding, because he offers no evidence of a prior complaint of racism.
It is clear enough from the deposition testimony that the officer who testified against plaintiff in 1980, Sergeant Strassner, was the primary source of Captain Chechak’s account to the reporter that the bar had closed four years earlier on account of a drunken-driving accident. Other officers had told him the same thing in Clinton Section briefings after the new establishment opened. Plaintiff claims in his motion papers that Chechak denied telling the reporter what was ascribed to him in the article, but Chechak’s deposition testimony acknowledged that he told the media of the incident, although Chechak *767 maintained that it was the amusement license that was lost, not the liquor license. Strassner also testified that he told Chechak of the accident and its "causal connection” to Cisco’s loss of an amusement license. The reporter was the only witness who claimed that Chechak referred to the liquor license.
Plaintiff was, fully nine years before publication, i.e., from 1979 to 1982, well known as Cisco and he had ingenious ways of promoting his business. Plaintiff’s affidavit, however, establishes without material contradiction that he "never advertised myself, I never promoted myself, and all I did was advertise the business” (emphasis supplied). He adds that, "[f]rom 1982 to 1991 [when the article appeared], I did not advertise the business * * * did not engage in politics * * * did not engage in political activity, and only tried to make a living.”
B. Whether Lee is a public figure
Defendants contend that plaintiff is a public figure, and that therefore he must, in response to the motions for summary judgment, raise an issue of fact whether defendants defamed him with "actual malice”, in the sense that the defendants knew of the falsity or acted in reckless disregard of the truth. (New York Times Co. v Sullivan, 376 US 254 [1964]; James v Gannett Co., 40 NY2d 415, 421 [1976].) To take advantage of this higher standard of fault, defendants point to plaintiff’s high profile effort to promote his business. But they fail to grapple with the primary obstacle to this argument, which is that no public controversy attended plaintiff’s self-promotion efforts — at least defendants adduce no evidence of such a public controversy sufficient to create an issue of fact — and plaintiff closed his business fully nine years prior to publication of the false article. Plaintiff avers without contradiction that no promotion under the Cisco name, or any other name for that matter, was undertaken by him in the interim. Accordingly, defendants cannot take advantage of the higher, constitutional or "actual malice” standard, and (on Gannett’s motion) plaintiff need only adduce evidence in admissible form creating an issue of fact that Gannett "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199 [1975]; see, Gertz v Robert Welch, Inc., 418 US 323 [1974] [requiring States to establish fault standards for press/media defendants in private defamation suits *768 arising out of publications involving a matter of public concern].) Because defendants urge the public figure categorization of plaintiff in quite insistent terms, a careful evaluation of their arguments is made necessary.
The public figure classification, which triggers the actual malice standard of New York Times (supra), is defined as follows: "In Gertz v Robert Welch, Inc. (418 US 323, 345), the court defined public figures as persons who 'have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.’ (See, also, Curtis Pub. Co. v Butts, 388 US 130, 164, supra [concurring opn of Warren, Ch. J.].)” (James v Gannett Co., 40 NY2d, at 421-422, supra.) There are, generally, two categories of public figures recognized in the cases: (1) public figures for all purposes who have "general fame [and] notoriety in the community” (Gertz v Robert Welch, Inc., 418 US, at 351-352, supra), and (2) so-called "vortex” public figures who "[voluntarily injected] themselves [into a] public controversly] in order to influence the resolution of the issues involved.” (Gertz v Robert Welch, Inc., 418 US, at 345.) A third category, "involuntary public figures” who are "involved-in or directly affected by the actions of officials” because of an arrest or some other similar event, is described in the literature (Tribe, American Constitutional Law § 12-13, at 880 [2d ed 1988]), and has some recognition in the cases. (Gertz v Robert Welch, Inc., 418 US, at 345; Foretich v Capital Cities/ ABC, 37 F3d 1541, 1551-1552 [4th Cir 1994].)
We are concerned here with the second or "vortex” category of public figure, the one described in James v Gannett Co. (supra) as one who " 'has taken an affirmative step to attract public attention’ ”, and who "voluntarily entered the public forum to influence public opinion”, thereby "enjoy[ing] significantly greater access to the channels of communication than a private person”. (Howard v Buffalo Evening News, 89 AD2d 793 [4th Dept 1982] [quoting James v Gannett Co., 40 NY2d, at 422]; see, Curry v Roman, 217 AD2d 314, 319 [4th Dept 1995]; Park v Capital Cities Communications, 181 AD2d 192, 197 [4th Dept 1992].) The reported cases on this issue often include stipulations that a plaintiff is, or is not, a public figure. (E.g., Freeman v Johnston, 84 NY2d 52, 56, n 4 [1994]; 2 *769 NY PJI 109-110 [1997 Supp] [collecting cases].) Therefore, they may not be consulted for full guidance on the issue in this case, because the parties sharply contest whether plaintiff is a public figure.
Although the question of a plaintiff’s status as a public figure is one of "federal constitutional law and Supreme Court rulings are controlling” (Harris v Quadracci, 48 F3d 247, 250, n 5 [7th Cir 1995]), a decision whether the Federal Constitution bars recovery is only necessary if State law would permit recovery on these facts. (Underwager v Salter, 22 F3d 730, 733 [7th Cir 1994] ["Constitutional defenses are irrelevant unless state law creates liability”].) Yet the law of defamation in New York "ha[s] come under the influence of constitutional doctrine in the wake of New York Times” to such an extent that an examination of both Federal and State cases must be made for adequate guidance. (Supra, 22 F3d, at 733 [interpreting Wisconsin law]; cf., in another context, Gross v New York Times Co., 82 NY2d 146, 153 [1993] ["the wisdom to be derived from the formerly utilized commonlaw analysis has (not) been completely discarded”].) In New York, the public figure status inquiry is sufficiently informed by Federal constitutional rulings that it is profitable to examine them in more detail. (James v Gannett Co., 40 NY2d, supra, at 421-423.)
Defendant’s attempt to establish plaintiff’s status as a public figure is almost wholly reliant on plaintiff’s promotion of Cisco’s as an amusement bar between 1979 and 1982. Defendants do not detail these self-promotion efforts other than to assert that, during those years, Cisco’s was a "famous” establishment patronized by some 2,000 customers per week who signed in and became a part of an extensive mailing list campaign undertaken by plaintiff. Defendants assert further that Cisco’s advertised on the radio, handed out about 10,000 Cisco buttons ("everybody wore one about ten years ago”), and that plaintiff regularly "attach[ed] himself to people * * * who were kind of high profile.” Nothing is alleged of plaintiff’s activities between the time plaintiff closed his bar in 1982 and the time the false article was written in 1991. Plaintiff concedes only that the Cisco’s name continued to be known enough in the community to make the article’s identification of the bar’s prior name instantly recognizable as a reference to him.
There is a four-part test helpful in determining whether plaintiff is a public figure. "A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject *770 of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.” (Lerman v Flynt Distrib. Co., 745 F2d 123, 136-137 [2d Cir 1984], cert denied 471 US 1054 [1985]; see also, Little v Breland, 93 F3d 755, 757 [11th Cir 1996]; Harris v Quadracci, 48 F3d, supra, at 251; Waldbaum v Fairchild Publs., 627 F2d 1287, 1296-1298 [DC Cir 1980], cert denied 449 US 898 [1980], cited with approval in Anderson v Liberty Lobby, 477 US 242, 246, n 3 [1986].) The New York law of public figure classification uses a similar approach, although it is not articulated in terms of separate elements. In James v Gannett Co. (40 NY2d 415 [1976], supra) and in Maule v NYM Corp. (54 NY2d 880 [1981]), the Court spoke in terms of plaintiffs (1) who " 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved’ ” (James v Gannett Co., 40 NY2d, at 421 [quoting Gertz v Robert Welch, Inc., 418 US 323, 345, supra]); (2) who " 'invite attention and comment’ ” by "tak[ing] an affirmative step to attract public attention” with respect to the subject of the allegedly defamatory commentary (supra, 40 NY2d, at 421-422 [quoting Gertz v Robert Welch, Inc., 418 US, at 345], 422-423; (3) who "project” their "name and personality” (Maule v NYM Corp., 54 NY2d, at 882) before the community or "into the limelight” (Curry v Roman, 217 AD2d, supra, at 319) as a "leading authority” on the subject of the litigation (Maule v NYM Corp., 54 NY2d, at 883 [which seems to be the functional equivalent of "assuming) a position of prominence” in the Lerman formulation]); and (4) who maintain "continuou[s]” contact with the press or media. (Supra, 54 NY2d, at 882.) An important point is that, like the Federal authority cited above, New York cases hold that the limited public figure harbors that status only for the particular controversy she thrusts herself into. (James v Gannett Co., 40 NY2d, at 423 ["public figure with respect to accounts of her stage performances”]; Curry v Roman, 217 AD2d, at 319 ["voluntarily thrusting themselves into the limelight in seeking media attention for the auction” which was the subject of the allegedly defamatory article] [emphasis supplied]; Park v Capital Cities Communications, 181 AD2d, supra, at 197 ["public figure for purposes of the ' "Park Probe” ’ ”]); Di Bernardo v Tonawanda Publ. Corp., 117 AD2d 1009, 1011 [4th Dept 1986] ["public figure in the context of this appointment controversy”].)
*771 On no view of the evidence submitted in connection with this motion is plaintiff a public figure. There was evidence of two license problems at Cisco’s a decade before, but nothing has been submitted on this motion which suggests that they involved a public controversy, or even that plaintiff’s problems more than a decade ago were reported in the press or media (the reporter testified that he did a word search for Cisco’s in the newspapers’ archives, which turned up negative), or further that anything of consequence concerning those difficulties would lead "a reasonable person * * * [to] have expected persons beyond the immediate participants * * * to feel the impact of its resolution.” (Waldbaum v Fairchild Publs., 627 F2d, supra, at 1297; see, Fairley v Peekskill Star Corp., 83 AD2d 294, 301, 302-303 [2d Dept 1981].) Litigation, of an administrative kind or otherwise, even if accompanied by press coverage (which no party asserts occurred here), does not alone "render the dispute a 'public controversy.’ ” (Foretich v Capital Cities/ ABC, 37 F3d, supra, at 1554.)
The foregoing disposes of the public figure analysis, but it is worthwhile to observe briefly that defendants do not meet other elements of the public figure test either. Plaintiff’s efforts to promote his bar and dance club nearly a decade before did not involve an effort to influence others on any subject which concerned the writer of the article. There is absolutely no evidence that plaintiff voluntarily involved himself in the two license suspensions in such a way as to grab the "limelight” or achieve " 'special prominence’ ” in any debate concerning whether the licenses should not have been suspended. (Waldbaum v Fairchild Publs., 627 F2d, supra, at 1297 [quoting Gertz v Robert Welch, Inc., 418 US, supra, at 351].) Looking to what little is proffered concerning "plaintiff’s past conduct, the extent of press coverage, and the public reaction to his conduct and statements” (Waldbaum v Fairchild Publs., 627 F2d, at 1297), the latter two of which simply did not occur in this case, it cannot be said that defendants have raised an issue of fact on these other discrete elements of the public figure analysis. Finally, even if any evidence of a public controversy on the license suspensions had been proffered by defendants, and defendants proved that plaintiff defended himself in the media, that would not mean that plaintiff was a public figure. (Foretich v Capital Cities/ ABC, 37 F3d, supra, at 1556-1559, 1564 [reasonable public reply to accusation may be made without forfeiting private person status]; see, Meadows v Taft Broadcasting Co., 98 AD2d 959, 960 [4th Dept 1983]; Fairley v Peekskill Star Corp., 83 AD2d, supra, at 302.)
*772 This analysis is consistent with the decisions claimed by defendants to support their position. First, in James v Gannett Co. (supra), the belly dancer enlisted the press in an effort to promote her "life and trade” (supra, 40 NY2d, at 417). Moreover, the allegedly defamatory article, printed immediately after her purposeful enlistment of the press, directly concerned the views of her life that she sought to portray. (Supra, 40 NY2d, at 423.) Here, by contrast, there is no showing that plaintiff enlisted the aid of the press in his self-promotion efforts except in purchasing an unspecified amount of advertising on a local radio station, and there is no showing that the advertising concerned any matter of public controversy. (Fairley v Peekskill Star Corp., 83 AD2d, supra, at 302-303.)
Similarly, in Maule v NYM Corp. (54 NY2d, at 882-883, supra), plaintiff was a member of the press and promoted himself in the press and media as a "leading authority on professional football”, the very subject of the allegedly defamatory article. In Cera v Gannett Co. (47 AD2d 797 [4th Dept 1975]), the public figure chiropractors "conced[ed] that they 'thrust themselves to the forefront’ of” "[the] public debate concerning chiropractic medicine” "by presenting their unsolicited views on the local television broadcast”, which was the subject of the alleged defamation. And in Howard v Buffalo Evening News (89 AD2d 793 [4th Dept 1982], supra), the plaintiffs were media outlet owners who, as in Maule, manifestly had access sufficient to confer public figure status, which access was employed to "influence public opinion” in connection with "the subject matter of the alleged defamatory article.”
Thus, the issue is not, as defendants would have it, that the plaintiffs in these cited cases went "to far lesser lengths than plaintiff to promote their business.” (Gannett mem, at 15.) If that was the only criterion, any business that advertised would, merely by the fact of advertising, become a public figure, a proposition rejected in the cases. (Long v Cooper, 848 F2d 1202, 1205-1206 [11th Cir 1988]; Golden Bear Dist. Sys. v Chase Revel, 708 F2d 944, 952 [5th Cir 1983]; Sims Ford v Hagel, 42 Wash App 675, 679, 713 P2d 736, 739 [1986]; Bank of Ore. v Independent News, 298 Ore 434, 443-444, 693 P2d 35, 42 [1985], cert denied 474 US 826 [1985].) Rather, the issue is whether plaintiff injected himself into a press or media reported debate on some public controversy (if he did so by advertising, of course, such advertising would be relevant — Samuels v Berger, 191 AD2d 627, 630 [2d Dept 1993]), and whether the allegedly defamatory *773 article concerned that particular controversy. Those elements are not met here; that is, defendants raise no issue of fact on these elements of the public figure test. (Compare, Maule v NYM Corp., 54 NY2d, supra, at 881-882, n [reserving the question whether the public figure issue should, when issues of fact exist, "be determined by the court or by the jury or by both”], with 2 NY PJI 111 [1997 Supp] [collecting cases] [public figure determination "is a matter of law for the court to decide * * * and on that question the defendant has the burden of proof’].)
There is another reason why defendants do not succeed in their argument that plaintiff is a public figure. Even if plaintiff could be deemed a public figure, plaintiff fully establishes without contradiction that he has "succeeded for the most part in returning to * * * private life”. (Wolston v Reader’s Digest Assn., 443 US 157, 163 [1979].) The Supreme Court has left open the question "whether or when an individual who was once a public figure may lose that status by the passage of time.” (Supra, 443 US, at 166, n 7.) Subsequent cases pretty much uniformly have held, in the circumstances confronting the court in those cases, that the plaintiff in question did not lose his or her public figure status over time. (See, e.g., Milsap v Journal/ Sentinel, Inc., 100 F3d 1265, 1269-1270 [7th Cir 1996]; Contemporary Mission v New York Times Co., 842 F2d 612, 619-620 [7th Cir 1988], cert denied 488 US 856 [1988].) Defendants make much of these cases in their postargument submissions. But the better reasoned decisions hold in addition that no per se rule is created and "that the passage of time will not necessarily change an individual’s status as a public figure.” (Contemporary Mission v New York Times Co., 842 F2d, at 619 [emphasis supplied]; see, supra, 842 F2d, at 620 [in which the plaintiffs continuously used the media during the four-year hiatus to seek public attention with respect to the very business activities which were the subject of the earlier controversy]; cf., Foretich v Capital Cities/ ABC, 37 F3d 1541, 1553, supra [whether "the plaintiff retained public-figure status at the time of the alleged defamation”]; Lerman v Flynt Distrib. Co., 745 F2d 123, 137, supra ["mainten(ance of) regular and continuing access to the media”]; Maule v NYM Corp., 54 NY2d, at 882, supra [maintaining "eontinuou(s)” contact with the press or media].)
Plaintiff closed his business nine years before the article on the shootings in the new establishment was published. He never reentered the business, and there is nothing in the record from which it may be concluded that he has not fully *774 slipped into obscurity. Defendants cannot establish a prior "public controversy” for public figure analysis purposes by reference to publication of an article a decade after plaintiffs initial difficulties were resolved, evidently without public* comment or controversy, which concerned a shooting in a bar and dance club owned by someone else wholly unconnected with plaintiff. If plaintiff had injected himself in some public controversy at the time he owned the place, which was of continuing interest and precipitated further public comment when the shootings happened, plaintiff would "assum[e] the risk of negative public comment on his role in the controversy, both contemporaneously and into the future.” (Milsap v Journal/ Sentinel, Inc., 100 F3d, supra, at 1270.) But that is not the case here. (Cf., Meadows v Taft Broadcasting Co., 98 AD2d, supra, at 960 ["Any controversy * * * was of short duration”].)
C. Whether plaintiff raises an issue of fact whether Gannett acted in a grossly irresponsible manner
Having established that plaintiff is not a public figure, it is clear that he may defeat Gannett’s motion under the lesser standard of proof established for this class of cases in Chapadeau v Utica Observer-Dispatch (38 NY2d 196 [1975], supra). The question devolves to whether plaintiff raises an issue of fact .whether "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.” (Supra, 38 NY2d, at 199.)
Because the undisputed evidence shows that the reporter relied on an unsworn report of a law enforcement officer, Gannett is entitled to summary judgment unless plaintiff shows that the reporter or his editors had reason to doubt the accuracy of Captain Chechak’s account. (Robart v Post-Standard, 52 NY2d 843 [1981], affg 74 AD2d 963 [3d Dept 1980] ["the reporter would have no reason to doubt the accuracy of the. information supplied (by a State Trooper public information pfficer over the telephone) and relying upon it did not demonstrate gross irresponsibility, even though the report given by the officer later proved to be inaccurate”]; Von Gerichten v Long Is. Advance, 202 AD2d 495, 496 [2d Dept 1994] [same].) "A newspaper reporter is entitled tó rely on official reports by law enforcement officers, including unsworn reports [citations omitted] unless the reporter is aware of the probable falsity of the reports or has some reason to doubt their accuracy” (Mitchell v Herald Co., 137 AD2d 213, 217 [4th Dept 1988] [collecting *775 cases]). "Reliance on a news release is a paradigmatically 'routine newspaper reporting techniqu[e].’ ” (Florida Star v B. J. F., 491 US 524, 538 [1989] [quoting Smith v Daily Mail Publ. Co., 443 US 97, 103 (1979)].)
The only conflict in the deposition testimony concerning what Chechak told the reporter concerned whether Cisco’s lost its amusement license or liquor license after the alcohol-related auto accident. On all other aspects of the allegedly defamatory publication, the witnesses were in agreement, including the club’s name, the drunken-driving accident, and the fact that a license (of some kind) was lost after the accident. Plaintiff raises some minor discrepancies concerning the date of the accident and how closely related the accident was to the license loss, but we are here concerned in applying the gross irresponsibility standard with any conflict in the testimony of the City defendants and the reporter. Strassner and Chechak both testified that they discerned a connection between the auto accident and the license loss, although both disclaimed that it was the official reason given for the loss, and Chechak testified, as did the reporter, that the former told the reporter of the connection.
The problem for summary judgment jurisprudence is that Chechak referred to an amusement license in his testimony and the reporter referred to a liquor license. For purposes of Gannett’s motion, therefore, we must assume for plaintiff’s benefit that Chechak referred to the amusement license and that the reporter got it wrong in his story. But this discrepancy raises no material issue of fact under Chapadeau’s gross irresponsibility standard. (Compare, Landsman v Tonawanda Publ. Corp., 186 AD2d 1028 [4th Dept 1992] [where the detective denied saying anything at all to the reporter]; Hairston v Bancorp, Inc., 20 Media L Rep 1600, 1992 WL 368789, 5 [Sup Ct, NY County, Apr. 15, 1992] [Ciparick, J.] ["denials by 'sources’ that they made any disparaging statements about plaintiff to reporters * * * constitute a showing of facts sufficient to require a trial regarding the reporter’s 'irresponsible’ conduct”] [emphasis supplied].) In the section below granting the City defendants’ motion for summary judgment in the face of a similar discrepancy (for purposes of the City’s motion, it must be assumed below for plaintiff’s benefit that Strassner accurately identified the license lost and that Chechak made the mistake in the press briefings), it is observed that the doctrine of substantial truth does not entitle defendants to summary judgment with respect to the statement taken as a whole, *776 because plaintiff raises an issue of fact whether other aspects of the publication, particularly the drunken-driving aspect, was connected in any way to the license loss. (See, infra, n 1.) Nevertheless, by borrowing some helpful principles from the substantial truth cases, it is concluded below that Chechak was not negligent in failing to foresee and protect against any incremental harm arising because of his misidentification of the license lost after the accident, because no reasonable juror would find any incremental harm by reason of the misidentification, given that Chechak was privileged to rely on all other aspects of what Strassner and other officers told him of the accident and its connection with Cisco’s. (See, infra, part [D] [3]; see, Fairley v Peekskill Star Corp., 83 AD2d 294, 297, supra [where reporter entitled to credit some of the statements, "(t)he actionability of some of the other comments published in the article is best measured against the standard of care required to be used in publishing them”].) If Chechak was not negligent in his misidentification, a fortiori Gannett was not grossly irresponsible under the heightened Chapadeau fault standard. (Fairley v Peekskill Star Corp., 83 AD2d, at 303-304.) Accepting the reporter’s privilege under Chapadeau (supra) to rely on all other aspects of Chechak’s account of the bar’s prior history, it cannot be said that-the reporter’s "single factual error” raises an issue of fact whether Gannett acted in a grossly irresponsible manner. (Velella v Benedetto, 83 AD2d 465, 467 [1st Dept 1981], affd on opn below 57 NY2d 788 [1982].)
Finally, with respect to Gannett’s motion, the alleged bias or racism of Sergeant Strassner, not supported by anything other than plaintiff’s wholly conclusory assertions in his affidavit, is irrelevant to Gannett’s liability under the gross irresponsibility standard because plaintiff does not adduce any admissible evidence that the reporter (or any Gannett employee for that matter) knew that Strassner was Chechak’s source, or that, if it was known that Strassner was the source, the reporter knew of Strassner’s alleged racism, or that the reporter had reason to suspect that the account of the bar’s prior history was racially motivated and therefore suspect. (Chiaken v VV Publ. Corp., 907 F Supp 689, 697 [SD NY 1995] [the source’s anti-Jewish or anti-Israel "subjective beliefs are irrelevant to an inquiry into whether the Voice acted in a grossly irresponsible manner”]; Gaeta v New York News, 62 NY2d 340, 351 [1984] [reporter had, with respect to her source, "no reason to suspect any animus toward the plaintiff”].)
Accordingly, Gannett is entitled to summary judgment dismissing the complaint.
*777 D. The City’s motion for summary judgment
The Appellate Division denied an earlier motion for summary judgment by the City and Chechak, which was brought at the pleading stage on qualified immunity grounds (failure to show common-law malice). (Lee v City of Rochester, 195 AD2d 1000, 1001, supra.) After discovery, the City defendants move again for summary judgment, this time on the ground of failure to show constitutional "actual malice”. The question is whether we are any further along. The City defendants say we are, because they are protected by Gertz (418 US 323, supra) in the same manner as Gannett, and that therefore the same burden of proof should apply to them. Plaintiff contends, however, that strict liability for the statements is the applicable standard, and that in any event he raises an issue of fact whether Chechak’s statement was maliciously made (by reference to plaintiff’s assertion in his affidavit that Sergeant Strassner, upon whom Chechak relied for his press conference account of Cisco’s prior history, is a racist and had it in for plaintiff). The deposition testimony helps us to clarify the conflicting testimony of Strassner, Chechak, and the reporter, and conclude that no material conflict exists to preclude entry of summary judgment now.
1. Whether Gertz applies to nonmedia defendants such as Chechak and the City
The City defendants insist that plaintiff’s burden of proof against them is the same as the Constitution requires in the case of media/press defendants. The argument is maintained in the context of Gannett’s effort to gain advantage of the New York Times actual malice standard, ruled unsuccessful above. But the fate of Gannett’s argument does not relieve the court of the responsibility to determine whether Gertz (supra) also applies to the case against the City defendants. If Gertz does not apply to the City defendants, summary judgment is precluded unless common-law qualified immunity applies, because no one contests that what Chechak said about the liquor license and drunken-driving accident was false. Defendants’ effort to show that the entire statement, though inaccurate, was true enough to preclude liability even in the *778 absence of qualified immunity, is without merit, and does not warrant extended discussion.[1]
The Supreme Court’s refusal explicitly to adopt the position that a plaintiff’s burden with respect to nonmedia defendants is the same as that applicable to media and press defendants, under the New York Times and Gertz formulae (Milkovich v Lorain Journal Co., 497 US 1, 20, n 6 [1990]; compare, supra, 497 US, at 24, n 2 [Brennan, J., dissenting]; Philadelphia Newspapers v Hepps, 475 US 767, 779, n 4 [1986]; compare, supra, 475 US, at 779-780), has not deterred some New York courts from holding that the standard applicable to nonmedia/ press defendants is, indeed, the same. (McGill v Parker, 179 AD2d 98, 108 [1st Dept 1992]; Pollnow v Poughkeepsie Newspapers, 107 AD2d 10, 16 [2d Dept 1985], affd on other grounds 67 NY2d 778, 780 [1986]; see, discussion in 2 NY PJI 119 [1997 Supp]; see also, Foretich v Capital Cities/ ABC, 37 F3d 1541, 1563, n 39 [4th Cir 1994], supra [pointing out that the Restatement (Second) of Torts § 580B, comment e; § 621, comment b (1977) suggests "that Gertz applies to media and nonmedia defendants alike”].) The New York Court of Appeals once held to that position (Trails W. v Wolff, 32 NY2d 207, 216-217, n 6 [1973]), but did so in reliance on Rosenbloom v Metromedia, *779 Inc. (403 US 29 [1971] [plurality opn]), which was subsequently repudiated in Gertz (supra), then was revived, but not on this point, in Dun & Bradstreet v Greenmoss Bldrs. (472 US 749 [1985]) and Hepps (supra). The Court of Appeals has not treated the issue since the explicit reservations of the question in Milkovich and Hepps. (See, e.g., Mahoney v Adirondack Publ. Co., 71 NY2d 31, 38-39 [1987] ["(constitutional) protections vary considerably in scope and content depending on such factors as * * * perhaps, whether or not the defendant is a member of the media”] [emphasis supplied]; Steinhilber v Alphonse, 68 NY2d 283, 289, n 1 [1986].)
The Fourth Department, however, has sent conflicting signals. In Rupert v Sellers (65 AD2d 473 [4th Dept 1978], affd 50 NY2d 881 [1980], cert denied 449 US 901 [1980]), a majority of the Appellate Division refused to adopt the view of the concurring Justice that Gertz and Chapadeau (supra) "ha[ve] application to a private defamation suit where, as here, the defendant is a nonmedia publisher.” (Supra, 65 AD2d, at 482 [Cardamone, J., concurring].) The majority opinion eschewed "Justice Cardamone’s belief that Gertz, as implemented by * * * Chapadeau * * * established a rule which binds us in this case and that there may be no liability in any defamation action without proof of fault.” (Supra, 65 AD2d, at 474 [Simons, J.].) In Park v Capital Cities Communications (181 AD2d 192 [4th Dept 1992], supra), however, the Court embraced Gertz’s imposition of a fault standard, and applied Chapadeau’s gross irresponsibility standard in a case of a private defendant and a private plaintiff, without citation to Rupert v Sellers. (Supra, 181 AD2d, at 197-198.) The divergent results in the two cases perhaps may be explained by the fact that Rupert v Sellers involved a publication of wholly private concern (65 AD2d, at 475 ["private matters”]), and in Park v Capital Cities "the publication involve[d] a matter of public concern”. (181 AD2d, at 197-198.) But that observation does not dispose of the matter, because the rule espoused by the Rupert v Sellers concurrence embraced all communications, both public and private, and because the facts of each case did not require a determination of the reach of Gertz to nonmedia defendants.
The latter point was recognized explicitly in both cases. In Rupert v Sellers, the "evidence in the record [was considered] sufficient to meet any predictable burden of proof, be it negligence, actual malice or some intermediate degree of fault.” (Supra, 65 AD2d, at 475 [majority opn].) In Park, the Court’s observation concerning the reach of Gertz and Cha *780 padeau (supra) was provided as one of "several grounds which make summary disposition appropriate in this action” (supra, 181 AD2d, at 195), and therefore was dictum. The Court held as a primary matter that the entity defendant’s publication "[wa]s not reasonably susceptible of the defamatory meaning ascribed to it by plaintiffs” (supra, 181 AD2d, at 195), and that the individual defendant’s "remark” was a protected expression of opinion. (Supra, 181 AD2d, at 196-197.) The Court’s "public figure” analysis (supra, 181 AD2d, at 197-198), therefore, was unnecessary to the decision and cannot, particularly in light of the careful mode of analysis undertaken by the majority in Rupert v Sellers (65 AD2d, at 475), be taken as authoritative precedent embracing (then) Justice Cardamone’s acceptance (supra, 65 AD2d, at 482-483) of Gertz’s application to private defendants.
Having concluded that the reach of Gertz and Chapadeau (supra) has not been identified by either the Court of Appeals or the Fourth Department, it remains for consideration whether decision on the point is any more necessary here than it was in Rupert v Sellers or Park v Capital Cities (supra). Because the allegedly defamatory publication in this case manifestly involved a matter of public concern, it may be comfortable to conclude that Gertz’s directive that the State impose a fault standard of its own choosing is applicable. Given the reluctance of the Supreme Court and our Court of Appeals to so conclude, the restrained analysis of Rupert v Sellers (65 AD2d, at 475) presents itself as the required approach.[2] If the proof of constitutional malice was so abundant in that case as to make unnecessary a decision what standard actually applied (supra, 65 AD2d, at 475), it follows that a plaintiff’s inability to meet any possibly applicable standard of proof under State law, or a fault standard complying with Gertz’s directive to the States, renders unnecessary a decision whether Gertz applies to this nonpress /media defendant case. Completing this mode of analysis requires a decision (A) whether Chechak’s alleged defamation of plaintiff is covered by a qualified privilege under New York law, (B) whether, if so, plaintiff has adduced *781 sufficient evidence in admissible form of common-law malice to preclude entry of summary judgment, and (C) whether plaintiff has adduced evidence in admissible form of fault under the lowest possible standard allowed by Gertz to preclude summary judgment under the Gertz formula. Because plaintiff can raise no issue of fact meeting the above standards of proof, the reach of Gertz need not be decided, and summary judgment may be granted to the City defendants.
2. Qualified privilege
Chechak’s defamation of plaintiff at the press conference unquestionably involved a communication covered by a qualified privilege under New York law. On the prior motion for summary judgment, the Appellate Division plainly accepted that Chechak’s statements might be covered by qualified immunity, but denied the motion on the ground that questions of fact existed whether his statements about the prior incident at Cisco’s were "gratuitous and irrelevant” or otherwise "[not] germaine to the shooting being investigated by the police.” (Lee v City of Rochester, 195 AD2d 1000, 1001, supra.) There is, on this motion, no issue of fact about what Chechak told the press, other than whether it concerned Cisco’s loss of a liquor license (as the reporter asserts) or an amusement license (as Chechak maintains). Chechak testified that he referred to the amusement license, not the liquor license, but on this motion we must assume that Chechak actually referred to the liquor license in the press conference. The testimony otherwise raises no issue of fact whether Chechak had reason to doubt the connection of the auto accident to Cisco’s and to the loss of a license (of whatever kind). Presuming for purposes of this motion that Chechak referred to the liquor license means that he knew, or reasonably should have known because of what he concedes Strassner told him, that his identification in the press briefing of the particular license lost by Cisco’s was mistaken and false.
Nevertheless, Chechak’s statements to the press were covered by a common-law qualified privilege, requiring plaintiff on this motion to produce evidence in admissible form raising a question whether the statements were made with ill will or spite, malice in the common-law sense. (Cheatum v Wehle, 5 NY2d 585, 600 [1959] [Van Voorhis, J., concurring] [effect of application of qualified privilege is that "a plaintiff may recover in a slander or libel suit on proving * * * malice and falsehood, without' their being presumed in his favor”].) Al *782 though application of a qualified privilege was "doubt[ed]” in Kelly v State of New York (131 AD2d 176, 181 [3d Dept 1987]), it is clear enough from Clark v McGee (49 NY2d 613, 620-621 [1980]) that a qualified privilege attaches to Chechak’s statement to the press. (See also, Santavicca v City of Yonkers, 132 AD2d 656, 657 [2d Dept 1987], cited in Lee v City of Rochester, 195 AD2d, supra, at 1001; cf., Cheatum v Wehle, 5 NY2d, at 598, 600 [Van Voorhis, J., concurring].) The question raised earlier by the Appellate Division whether the statements were "gratuitous”, "irrelevant” or otherwise "germaine” to the recent shooting spree is more properly considered under the rubric of the generic common-law malice inquiry. Otherwise, the question of the applicability of the privilege would become a tautology. The factors of gratuitousness, irrelevancy and germaneness to the subject matter of permissible communication covered by the qualified privilege are but a part, only, of the over-all inquiry whether the communication was "expressed 'in a reasonable manner and for a proper purpose.’ ” (Toker v Pollak, 44 NY2d 211, 219 [1978] [quoting Prosser, Torts § 115, at 786 [4th ed 1971]; see also, Herlihy v Metropolitan Museum of Art, 214 AD2d 250, 259-260 [1st Dept 1995] [treating the issue of gratuitousness and irrelevancy as but one factor from which malice may be inferred].)[3]
Particularly in the absence of an identified motive for the shootings, it would have been natural for a curious reporter to ask whether there was anything in the bar’s prior history that might suggest why someone would feel free to come in and shoot the place up. Included within the expected range of such an inquiry would be whether there was trouble before, of a violent nature or otherwise, and no party challenges the reporter’s deposition testimony to that effect. No reasonable juror could conclude otherwise. If the answer to that question was no, and the Captain merely added that the only thing he could think of was loss of a liquor license some years prior in relation to a drunken-driving accident, there is no reason to deny the privilege by reason of gratuitousness, irrelevancy, or because those facts are not germaine. Irrelevancy, gratuitous *783 ness, and the issue of germaneness have reference to, in the peculiar context of common-law malice, "spite or ill will” (Liberman v Gelstein, 80 NY2d 429, 437 [1992]) — reaching out beyond or overextending oneself to say bad things about the plaintiff by reason of spite toward him. But general spite toward plaintiff, for example, of the kind plaintiff thinks Strassner harbored, is not enough, even if it could be imputed to Chechak (which it cannot without evidence that Chechak knew about it and did nothing). "In this context * * * spite or ill will refers not to defendant’s general feelings about plaintiff, but to the speaker’s motivation for making the defamatory statements”. (Supra, 80 NY2d, at 439; see, Grier v Johnson, 232 AD2d 846 [3d Dept 1996].) Chechak was motivated to make the statement by the reporter’s question and his knowledge of Cisco’s prior history obtained at precinct briefings. Even if plaintiff showed that Chechak did not particularly like plaintiff (which he hasn’t), "[i]f the * * * statements were made to further the interest protected by the privilege [here a free exchange between police investigating a serious crime and an inquiring press], it matters not that defendant also despised plaintiff * * * [because] a triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication’ ”. (Supra, 80 NY2d, at 439 [emphasis supplied] [quoting Stukuls v State of New York, 42 NY2d 272, 282 [1977].)
The fact that Chechak mistakenly referred to the liquor license in the face of what Strassner told him about the amusement license, as we must presume he did for purposes of this motion, raises no issue of fact that he acted with spite or ill will. Mistakes of that kind are precisely what the qualified privilege is designed to protect. Chechak and the City would clearly be entitled to summary judgment on common-law qualified immunity grounds.
3. Fault under the Gertz formula
Because the City defendants are entitled to summary judgment on purely State law grounds, the only remaining question is whether, if Gertz (supra) applies, plaintiff raises an issue of fact under the lowest fault standard allowed by Gertz. If not, it will be unnecessary to decide the reach of Gertz and to select an applicable fault standard on the assumption that Gertz applies.
Although actual malice in the constitutional sense is "not satisfied merely through a showing of ill will or 'malice’ in the *784 ordinary sense of the term” (Harte-Hanks Communications v Connaughton, 491 US 657, 666 [1989]), the Supreme Court has not decided whether common-law malice would satisfy a floor level of fault under the Gertz formula, presumably negligence. (Rupert v Sellers, 65 NY2d, supra, at 475 [identifying negligence and constitutional "actual malice” on opposite ends of the Gertz-approved fault spectrum]; see also, Palmisano v Modernismo Publs., 98 AD2d 953 [4th Dept 1983].) The answer assuredly must be no. Proving common-law malice satisfies the requirements of Philadelphia Newspapers v Hepps (475 US 767 [1986], supra) that plaintiff bear the burden of proving falsity, but it does not satisfy Gertz’s requirement that plaintiff also prove "fault”. Just as "actual malice” in the New York Times sense cannot be inferred from evidence of "spite or ill will”, that is malice in the common-law sense (Harte-Hanks Communications v Connaughton, 491 US, at 666-667, n 7), the fault required by Gertz (supra) cannot be established solely by reference to spite or ill will because those latter elements are subjective. They relate to spite toward the plaintiff as the reason for making the statement. (Liberman v Gelstein, 80 NY2d, at 439, supra.)
Under the Gertz formulation, by contrast, fault is an objective concept related to a statement’s falsity and the defendant’s mental state with respect to that falsity. (See, e.g., Restatement [Second] of Torts § 580B [c] [1977] ["negligen(ce) in failing to ascertain” falsity]; id., § 580B, comment c, at 223 ["measure of fault on the part of the defendant in regard to the falsity of the communication”] [emphasis supplied].) "In the Gertz case, the Court was adverting to the standard imposed on the defendant regarding the truth or falsity of the communication * * * [and in that] instance — truth or falsity — the Gertz decision has clearly changed the common law.” (Id., § 580B, comment d, at 224 [emphasis supplied].) Accordingly, failing to adduce evidence raising an issue under the common-law malice standard does not mean, necessarily, that plaintiff could not, on the same facts, raise an issue of fact under an applicable fault standard required by Gertz. (Thanasoulis v National Assn. for Specialty Foods Trade, 226 AD2d 227 [1st Dept 1996] [recognizing the difference between negligence with respect to truth or falsity and common-law malice, and holding that negligence may be present when common-law malice is absent]; cf., Gazette, Inc. v Harris, 229 Va 1, 18, 325 SE2d 713, 727 [1985], cert denied sub nom. Fleming v Moore, 472 US 1032 [1985] ["defendant may still avoid liability based on qualified privilege even though the negligence standard is met by the plaintiff”].)
*785 Determining whether plaintiff raises an issue of fact concerning fault requires identification of the particular fault standard applicable to this case. A by-product of the Court of Appeals failure yet to decide whether Gertz (supra) applies to nonmedia / press defendants is a lack of authoritative precedent establishing what the appropriate fault standard would be for a case such as this one. One case which applied Gertz to nonpress / media defendants did not insist on application of Chapadeau’s gross irresponsibility standard. (McGill v Parker, 179 AD2d 98, 108, supra [Chapadeau "may not always be apt in the case of a nonmedia defendant” despite the fact that "there can be no liability without a showing of fault”].) Gertz left to the States the development of fault standards applicable to the particular factual situations confronting the courts. (Chapadeau v Utica Observer-Dispatch, 38 NY2d, supra, at 199 ["the States should be accorded 'substantial latitude’ in fashioning a remedy based on fault”].) Chapadeau developed the gross irresponsibility standard for peculiarly media defendants. (McGill v Parker, 179 AD2d, at 108 [Chapadeau "is particularly suited to a media defendant”].) Following the directive in Rupert v Sellers (65 AD2d, at 475), a court such as this one should not decide in the first instance, unless made necessary by the facts, what alternative fault standard would be appropriate under Gertz in contexts not addressed by Chapadeau. But assuming that negligence would be a floor standard (Gertz v Robert Welch, Inc., 418 US 323, 353 [Blackmun, J., concurring]; Rupert v Sellers, 65 AD2d, at 475), we turn to an examination whether plaintiff raises an issue of fact whether Chechak failed to exercise due care with respect to the truthfulness of his statements to the press. Because plaintiff’s proof of negligence fails to raise a triable issue of fact, summary judgment in favor of the City defendants is appropriate no matter what fault standard is found appropriate.
In applying a negligence standard, the court draws upon the formulation in Gaeta v New York News (115 Misc 2d 483, 485 [Sup Ct, NY County 1982], affd 95 AD2d 315, 320-321, 325 [1st Dept 1983], revd 62 NY2d 340 [1984], supra): whether the defendants "failed to exercise ordinary care in * * * publishing false statements which defamed [plaintiff], considering the foreseeable danger of injury from the publication and the reasonableness of defendants’ conduct in proportion to that *786 danger.” (Supra, 115 Misc 2d, at 485.)[4] One aspect of this question focuses strictly on a defendant’s state of mind concerning falsity and another aspect focuses on whether there was "foreseeable danger of injury from the publication and the reasonableness of defendants’ conduct in proportion to that danger.” (Supra, at 485.)
Turning first to the former aspect, state of mind strictly . with respect to falsity of the statement, the issue is whether "the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based.” (Gazette, Inc. v Harris, 229 Va, at 15, 325 SEd 2d, at 724-725, supra; see also, Restatement [Second] of Torts § 580B, comment g, at 227 [1977] ["Insofar as the truth or falsity of the defamatory statement is concerned, the question of negligence has sometimes been expressed in terms of the defendant’s state of mind by asking whether he had reasonable grounds for believing that the communication was true”].) This is another way of asking whether the defendant had actual or constructive notice of the defamatory character of the statement, terms familiar to New York negligence law in other contexts. Where a Police Captain such as Chechak has reasonable grounds to believe that what he relays to press reporters is true, as naturally would be the case when he relies upon a fellow police officer’s account of events within the latter’s precinct, it is not unreasonable to put plaintiff to the burden of showing constructive notice, at least, that the statement is false. As in other negligence contexts, "general awareness” of the possibility of untruthfulness should not be enough. (Cf., Piacquadio v Recine Realty Corp., 84 NY2d 967, 969 [1994]; Gordon v American Museum of Natural History, 67 NY2d 836, 838 [1986]; see generally, 1A Warren, New York Negligence, Actionable Negligence, §§ 9.01-9.02 [2] [1988].) The rule may be different when a Captain such as Chechak does not rely upon *787 statements of fellow officers or does not have some other ostensibly credible source for the defamatory statement. But actual or constructive notice of the falsity of the statement should be required as part of the negligence inquiry in cases such as these.
In this case, plaintiff raises an issue of fact whether Chechak had actual or constructive notice that what he told the reporters (or what we must assume he told the reporters for purposes of this motion) did not conform with what Strassner and others actually told him of Cisco’s prior history. But that notice related only to identification of the particular license that Cisco’s lost. It did not concern any other aspect of what he said to the reporters. The fact of the accident, its connection to Cisco’s (at least in sequence with the license loss), that alcohol was involved in some way, and the fact that a license was lost, were all communicated to Chechak by Strassner and other police officers, according to the undisputed testimony at the depositions.
Plaintiff’s only effort to show constructive notice of falsity with respect to these latter matters is his wholly conclusory assertion of Strassner’s alleged racism, and the fact that the events which were the subject of the allegedly defamatory statement occurred some years ago, thus bringing into question reliance upon memory. The first assertion is wholly conclusory in form and raises no issue of fact whether Strassner is indeed a racist. But even if plaintiff’s proof with respect to Strassner created an issue of fact concerning Strassner’s motives, plaintiff makes no showing that Chechak knew of this, and he proves nothing from which it might reasonably be concluded that Chechak should have been aware of it. With respect to the memory issue, those cases cited by plaintiff which held that memory should not be relied upon involve situations in which some question concerning the veracity of the publication existed at the time the statement was made by the defendant. (Kerwick v Orange County Publs. Div. of Ottaway Newspapers, 53 NY2d 625 [1981] [editor’s own confession]; cf., Scacchetti v Gannett Co., 123 AD2d 497, 499 [4th Dept 1986] [gross irresponsibility standard].)[5] In this case, plaintiff points to nothing available to Chechak which would put him on no *788 tice that reliance on Strassner’s memory of events within his own precinct should be questioned.
Accordingly, plaintiff only raises an issue of fact concerning Chechak’s actual or constructive knowledge that his identification of the particular license lost was mistaken and therefore false. The liability question, however, does not end here. The facts which must be assumed for purposes of this motion do not permit of varying inferences concerning whether a reasonable person would foresee injury to reputation by reason of the misidentification. The cases on substantial truth, described above, are of some help even though they do not allow summary judgment on that ground alone in light of plaintiff’s many challenges to the publication taken as a whole. (See, n 1, supra.) When the only aspect of falsity known to the defendant concerns a minor detail which no reasonable person would find incrementally harmed plaintiff, it is appropriate to grant summary judgment on the ground that, as a matter of law, he could not have foreseen incremental harm to plaintiff’s reputation that would likely be damaged anyway by those aspects of the publication Chechak had no reason to disbelieve. Focusing on what Chechak had reason to doubt, that it was a liquor license loss instead of an amusement license suspension which was related to the drunken-driving accident near Cisco’s, "[t]he true damaging facts [or those Chechak had a right to think were true] * * * [were] closely related to the false ones [or those Chechak knew or had reason to know were false]” and "[t]he allegedly false facts about [plaintiff] were variants of the truth that did not paint him in a worse light.” (Haynes v Alfred A. Knopf, Inc., 8 F3d 1222, 1228, 1229.)
This reasoning is not subject to attack on the ground that loss of a liquor license is more serious than loss of an amusement license. In Miller v Journal-News (211 AD2d 626, 627 [2d Dept 1995]), for example, the Court found no incremental actionable harm by defendant’s choice of the word "suspended” for the article instead of the accurate term "administrative leave”. It is the implied reason for the loss and the fact of loss itself that in this case stings, not the misidentification of the particular license involved. The former items were far more *789 damning than the fact that one or the other subdivision of government caused Cisco’s to lose a license shortly thereafter. The actual fact that an amusement license was lost, given the underlying facts Chechak had a right to believe, "was neither materially different from [nor] significantly less damning than, the falsehood” in regard to the liquor license Chechak should have been aware of. (Desnick v American Broadcasting Cos., 44 F3d 1345, 1350, supra.)
This notice of falsity, with respect to only one aspect of an otherwise damning statement about Cisco’s, does not create an issue of fact concerning foreseeability of injury to plaintiff or the reasonableness of Chechak’s conduct in relation to the danger of injury. Summary judgment is available on the issue of foreseeability when the inferences all point one way. (Di Ponzio v Riordan, 224 AD2d 139, 144-146 [4th Dept 1996] [Wesley, J.], affd 89 NY2d 578 [1997].) Accordingly, and notwithstanding that summary judgment in a negligence action should rarely be granted (Andre v Pomeroy, 35 NY2d 361, 365 [1974]), it is appropriate to grant summary judgment in this case insofar as plaintiff’s action must be proved according to a fault standard sounding in negligence. If plaintiff can raise no material issue of fact under the floor negligence fault standard required by Gertz (supra), he cannot raise an issue of fact under any "intermediate” standard of proof contemplated by Gertz. (Rupert v Sellers, 65 AD2d 473, supra; see, discussion in part C, supra.)
Conclusion
Plaintiff is not a public figure, but Gannett is entitled to summary judgment because plaintiffs proof opposing the motion for summary judgment cannot meet Chapadeau’s gross irresponsibility standard. With respect to the City defendants’ motion, the court declines to decide the constitutional issue under Gertz (supra) whether the same fault standard applied to a media/press defendant should apply to a nonmedia/press defendant. Consistent with the approach of Rupert v Sellers (supra), however, the court finds that plaintiff’s proof in admissible form opposing the City defendants’ motion for summary judgment cannot meet any possibly applicable standard of proof required by State or Federal law. Summary judgment is granted to the defendants dismissing plaintiffs complaint.
[Portions of opinion omitted for purposes of publication.]

. Invocation of the doctrine of "substantial truth” to all aspects of the challenged publication would not be appropriate- in this case in the absence of fact finding upon appropriate instructions. While it is true that, when "a false accusation cannot do any incremental harm to the plaintiffs deserved reputation because the truth if known would have demolished his reputation already, he has not been harmed by the false accusation and therefore has no remedy”, the false accusation must be "closely related to the true facts” for this doctrine to apply. (Desnick v American Broadcasting Cos., 44 F3d 1345, 1350 [7th Cir 1995] [Posner, J.]; see, Cafferty v Southern Tier Publ. Co., 226 NY 87, 93 [1919] ["truth * * * so near to the facts as published”].) But license suspensions of short duration, on the grounds asserted by plaintiff to be true (pistol permit and traffic congestion) are "materially different from * * * [and] significantly less damning than, the falsehood” uttered by Chechak, which related drunken driving to a complete loss of the liquor license. (Desnick v American Broadcasting Cos., 44 F3d, at 1350.) It must be kept in mind that Chechak’s statement to the press, at least the statement we must assume he made for purposes of this motion (see, discussion in text infra), had three false aspects: one relating to the particular license lost, another relating to the nature of that loss (permanent loss or loss of renewal versus temporary suspension), and still another relating to the reason for the loss (because we must assume on this motion for plaintiffs benefit that the auto accident had no real connection with Cisco’s). We are not concerned here with state of mind (see, infra), but only with "substantial truth” of the statement as a whole. The issue is "ordinarily a jury question * * * [unless] no reasonable jury could find a significant incremental harm.” (Supra, 44 F3d, at 1350; see, PJI 3:33, and Comment, 2 NY PJI 192-193 [1997 Supp].)

. Following Rupert v Sellers (supra) complies with the familiar rule that constitutional issues be avoided if at all possible when other grounds for decision are dispositive. (Matter of Beach v Shanley, 62 NY2d 241, 254 [1984]; People v Felix, 58 NY2d 156, 161 [1983].) Adherence to the Fourth Department’s approach in Rupert p Sellers also satisfies the rule that a court at Special Term follow authoritative precedent in the department in which it sits even if contrary to the precedent in other departments. (1 Carmody-Wait 2d, NY Prac § 2:63, at 75 [1965].)

. In the constitutional malice context, the courts give considerable deference to the media/press "acting responsibly” in choosing, not only "what are matters of genuine public concern,” but also "what is 'reasonably related to matters warranting public exposition’ ” (Gaeta v New York News, 62 NY2d 340, 349, supra [quoting Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199, supra]). In this case, it is undisputed that Chechak’s statement was not volunteered, but was made in response to press questioning, as the Appellate Division recognized on the prior appeal.

. The Court of Appeals ultimately found that the negligence standard was inappropriate to the context of Gaeta (supra), but there was no disapproval of the trial court’s articulation of the negligence standard. Although there would be no reason to question the formulation if the standard was not applicable anyway, the trial court’s formulation in Gaeta is persuasive authority supporting the formulation employed here, especially because it follows Danielenko v Kinney Rent A Car (57 NY2d 198, 204 [1982] [" 'If the defendant could not reasonably foresee any injury as the result of his act, or if his conduct was reasonable in the light of what he could anticipate, there is no negligence, and no liability’ ”] [quoting Prosser, Torts § 43, at 250 [4th ed 1971]).

. In Scacchetti, the Court observed in dictum that the publisher’s reliance upon memory would, "[a]t best * * * constitute] negligence.” (Supra, 123 AD2d, at 499 [emphasis supplied].) But this was not a finding of negligence, especially in view of the finding that the publisher had no reason to doubt the accuracy of memory. "We are not here dealing with the discrep *788 ancy concerning the liquor license and amusement license. No one disputes that what Strassner told Chechak involved an amusement license. So Chechak had no discrepancy facing him which might put him on notice that memories should not be relied upon. Chechak relied on the police officer who patrolled the district. Chechak’s own mistake (i.e., the one we must assume on this motion that he made) provides no reason to doubt Strassner and the others.